## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

XIANGYUAN ZHU,                                    )
                                                 )
                          **Plaintiff,**          )
                                                 )         **CIVIL ACTION**
**v.**                                           )
                                                 )         **No. 04-2539-KHV**
**FEDERAL HOUSING FINANCE BOARD,  et al.,**       )
                                                 )
                          **Defendants.**         )
_____)

### MEMORANDUM AND ORDER

Xiangyuan Zhu *pro se* brings suit against the Federal Housing Finance Board ("Finance Board"), the Federal Home Loan Bank of Topeka ("FHLB-Topeka"), and individual directors, officers and employees of FHLB-Topeka.  Plaintiff asserts claims under 42 U.S.C. §§ 1981, 1982, 1983, 1985 and 1986; Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq.; ("Title II"); the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"); the First, Fifth, Thirteenth and Fourteenth Amendments to the Constitution of the United States; 18 U.S.C. § 1514A of the Sarbanes-Oxley Act of 2002; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1964 ("RICO"); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"); the Family and Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"); the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") ;Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA").[1]

---

[1]      Although plaintiff makes passing reference to the Rehabilitation Act, 29 U.S.C. §§ (continued...)

-1-

This matter comes before the Court on Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction (Doc. #86) filed February 15, 2005, Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint For Failure To State A Claim (Doc. #88) filed February 15, 2005, and the Motion Of Federal Housing Finance Board To Dismiss (Doc. #93) filed March 9, 2005. The so-called "Topeka defendants" include FHLB-Topeka; its directors, Ronald K. Went, Richard C. Berg, Duane L. Fager, David W. Herlinger, Bruce R. Lauritzen, Gilbert Lundstrom, James C. Orbison, B. Stephen Parker, Gregory Stine and Louis F. Trost; and FHLB-Topeka officers and employees, Andy Jetter, Executive Vice President, Mark Yardley, First Senior Vice President, Frank Tiernan, Sr. Vice President, Richard Schaplowsky, First Vice President and General Counsel, Dina Cox, Vice President and Director of Human Resources, Sherri Workman, Human Resources Generalist, Mark McLelland, Vice President and Director of Risk Management, Tommy Millburn, Vice President and Director of Internal Audit, Cindy Williams, User Support Analyst, and Chris Shumaker, Risk Analyst.

Also before the Court are the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want of Subject Matter Jurisdiction (Doc. #117) filed May 25, 2005, the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint For Failure To State A Claim (Doc. #118) filed May 25, 2005 and the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction – The

---

[1](...continued)
791-794, see ¶ 44, Amended Complaint (Doc. #72) filed December 13, 2004, a thorough reading does not reveal any claim under the Rehabilitation Act.

<u>Attachment Of Plaintiff's Outline Of Her Second Amended Complaint</u>, (Doc. #120) filed June 6, 2005, each of which the Court construes as a motion for leave to file a second amended complaint. The final motion before the Court is the <u>Motion To Strike</u> (Doc. #121) which the Topeka Defendants filed June 8, 2005, asking the Court to strike each of plaintiff's foregoing supplements.  As to the motion to file a second amended complaint, plaintiff has not complied with local rules regarding amendment of pleadings.  Under D. Kan. Rule 15.1(a), "a motion to amend shall set forth a concise statement of amendment sought to be allowed, with the signed original, and one copy of the proposed amended pleading, attached."  Plaintiff has not attached a copy of a proposed amended complaint.  The Court is therefore in no position to evaluate the sufficiency of her claims and overrules her motions to file a second amended complaint (as contained in Document ## 117, 118 and 120) and further overrules as moot defendants' motion to strike (Doc. #121).

<u>**Facts**</u>

Plaintiff's amended complaint alleges the following facts:

Zhu, a female member of a racial minority, was born on September 27, 1953.  In December of 1997, FHLB-Topeka hired Zhu as a financial analyst.  During the first six months of her employment she was promoted as Senior Risk Analyst and served in that capacity for about three years, through July 26, 2001. Zhu conducted balance sheet analysis and audited modeling results for the Risk Management Department.  She made detailed suggestions so that the model results would match the market values calculated in Accounting.  Zhu also served on the Interest Rate Risk Committee.

FHLB-Topeka is a district bank of the Federal Home Loan Bank system for Kansas, Colorado, Nebraska and Oklahoma. It is incorporated under 12 U.S.C. §§ 1421-49 and has its principal place of business in Topeka, Kansas.

The Fair Housing Finance Board ("Finance Board")

The Finance Board is an independent executive agency which was created as part of the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1421 et seq., as a successor to the Federal Home Loan Bank Board. The Finance Board consists of five directors, four of whom are appointed by the President and confirmed by the Senate. The fifth director is the Secretary for Housing and Urban Development. See 12 U.S.C. § 1422a(b)(l)(A&B). The primary duty of the Finance Board is to ensure that the 12 Federal Home Loan Banks operate in a financially safe and sound manner. See 12 U.S.C. § 1422a(a)(3)(A). The Federal Home Loan Banks are government sponsored enterprises (GSEs) as defined by 2 U.S.C. § 622(8), and they help assure an adequate supply of mortgage funds by making loans, to creditworthy financial institutions which then lend the funds to individual home buyers. See 12 U.S.C. § 1430.

Each Federal Home Loan Bank has individual financial institution "members" which share in the bank's ownership and management functions. All federally chartered savings and loan associations automatically become members of a Federal Home Loan Bank. Other financial institutions may become members if they meet eligibility requirements. See 12 U.S.C. §§ 1464(f), 1424(a). Federal Home Loan Banks also provide other services for their members, including check clearing, letters of credits and trustee functions. See 12 U.S.C. § 1431. Federal Home Loan Banks are federally-chartered corporations whose stock is held by their member financial institutions, and Federal Home Loan Banks do not receive operating funds from the federal government. Federal

-4-

Home Loan Banks are subject to the Government Corporation Control Act, 31 U.S.C. § 9101 <u>et seq</u>., which requires the Federal Home Loan Banks to submit annual management reports to Congress and subjects them to periodic government audits.  <u>See</u> 12 U.S.C. §§ 9105, 9106.

The capital stock of each Federal Home Loan Bank is issued in its own name and is owned entirely by its member institutions, which are required to purchase and maintain minimum levels of Federal Home Loan Bank stock.  <u>See</u> 12 U.S.C. § 1426(c). The banks distribute dividends to their shareholders, subject to Finance Board regulations.  <u>Id.</u> § 1426(h); 12 C.F.R. § 917.9 (2002).  The Federal Home Loan Banks obtain funds for advances and operating expenses through fees to member institutions for various services and by selling consolidated obligations in the capital and money markets.  These bonds, which are backed by secured advances and government insured or guaranteed mortgages, are not obligations and are not guaranteed by the United States government. <u>See</u> 12 U.S.C. §§ 1431(b), 1435.

A board of directors manages each Federal Home Loan Bank.  The Board is comprised of 14 members, eight of whom are elected by member institutions.  <u>See</u> 12 U.S.C. § 1427(a).  The Finance Board appoints the other six members of the board and also designates the chairman and vice-chairman.  <u>Id.</u> The Board then selects a president and other officers for the bank, subject to approval by the Finance Board.  <u>See</u> 12 U.S.C. § 1432(a).

The Finance Board has the power to remove any director, officer, employee or agent of any Federal Home Loan Bank.  <u>See</u> 12 U.S.C. § 1422b(a)(2).  Each Federal Home Loan Bank submits a budget for approval by the Finance Board.  Federal Home Loan Banks may only acquire or dispose of securities or other property with prior approval of the Finance Board or in accordance with stated

agency policy.  <u>See</u> 12 U.S.C. § 1432(a); 12 C.F.R.§ 956.2.  Other Federal Home Loan Bank functions, such as the taking of demand and time deposits, are carried out only upon terms and conditions the Finance Board may prescribe.  <u>See</u> 12 U.S.C. § 1431(e)(l).

Federal Home Loan Bank employees are not employees of the federal government.  <u>See</u> 12 U.S.C. § 1422b(a)(2).  Federal Home Loan Bank employees participate in a private employer retirement plan (the Financial Institutions Retirement Fund) which is not open to federal employees. Each Federal Home Loan Bank has the authority to hire and fire its employees at will, without recourse to any civil service remedy.  <u>See</u> 12 U.S.C. § 1432(a).

<u>Background of Legal Proceedings Involving Zhu and Marc Bunting</u>

In June of 1998, Zhu informed her real estate agent, Marc Bunting of Countrywide Realty, Inc., that she did not want to buy a house at 2918 SW Gainsboro Road.  Although it is not clear from the complaint, Zhu apparently was already living in the house.  Bunting called Zhu at work and threatened to sue her if she did not buy the house.  Bunting then went to FHLB-Topeka and threatened to sue Zhu because of her race.  Zhu purchased the home based on Bunting's promise to make repairs and Bunting kept a key to the home on the pretext of repairing the house.

From November 23, 1998 through June 13, 1999, Bunting went into Zhu's home and demanded sexual favors.  He threatened that if Zhu refused, he would destroy her.  When Zhu went to the Countrywide office to ask for home repairs, Bunting's secretary, Candace Thomas, yelled at her, "You are a Chinese, you should not come here, you should go find a Chinese man in the town." Zhu also went to Countrywide to ask for her key.  Bunting then called Zhu at FHLB-Topeka and threatened her with a restraining order.  He asserted that he would have her employer fire her, that

he would sue her and have police arrest her "but for" her race.  On June 30, 1999, Bunting went into Zhu's home and sexually assaulted her "but for" her race.

On July 1, 1999, Zhu took a written complaint to the Countrywide office and asked for the promised repairs.  Robert Thomas, a Countrywide employee, approached her in a threatening manner.  Thomas yelled at Zhu that if she ever came to Countrywide again he would have the police arrest her and have her employer fire her "but for" her race.

On May 12, 2000, Thomas G. Lemon, an attorney for Bunting, sent Zhu a certified letter which asserted  that she had stalked and harassed Bunting for two years and had criminally trespassed on his property.  The letter threatened Zhu with criminal proceedings "but for" her race. On May 19, 2000, Bunting's attorney filed a petition in the Third Judicial District Court of Kansas alleging that Zhu had violated Kansas trespass law and seeking a permanent restraining order.  After a two-day bench trial on November 1 and November 3, 2000, Judge Franklin R. Theis entered an order which permanently restrained Zhu "from being within 500 feet of [Bunting] wherever he may be found, except as any litigation or alternative dispute resolution proceedings require their joint attendance."

At some unspecified time, Tiernan (Senior Vice President of FHLB-Topeka) called Zhu into his office, told her that she had better accept the permanent restraining order, and threatened that she should not "go after the white male Mr. Lemon and the law firm." Amended Complaint (Doc. #72) ¶ 16.  Tiernan "unlawfully intimidated Ms. Zhu that the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public caused by the permanent restraining order" was the precondition for her employment at FHLB-Topeka.

On June 29, 2000, Zhu filed a complaint in the United States District Court for the District of Kansas, <u>Zhu v. Countrywide Realty, et al.</u>, Case No. 00-2290.  Zhu alleged that Bunting and others made negligent and/or fraudulent representations during the residential real estate transaction and discriminated against her on the basis of sex and race in violation of the Fair Housing Act, 42 U.S.C. § 3601 <u>et seq.</u>, and 42 U.S.C. §§ 1982 and 1983.  On August 2, 2001, about one month before the scheduled trial date, the undersigned judge ordered the parties to mediate with U.S. Magistrate Judge James P. O'Hara.  At the end of the mediation session on August 13, 2001, Zhu stated that she would not accept the settlement to which she had previously agreed, because it deprived her of her rights as a homeowner under the FHA.  On December 18, 2001, however, the Court ordered the parties to execute certain settlement documents and advised Zhu that if she did not do so, the Court would dismiss her case with prejudice.  Zhu did not sign the settlement documents, so the Court dismissed the case.  It later overruled Zhu's motions to reconsider.  On June 18, 2003, the Tenth Circuit affirmed.  <u>See</u> <u>Zhu v. Countrywide Realty Co.</u>, No. 02-3087, 2003 WL 21399026 (10th Cir. June 18, 2003).

<u>Defendants' Actions Related To Zhu's HUD Complaint</u>

On April 12, 2000, Tiernan called plaintiff into his office and yelled that she should not have bought a house in Topeka, that she was nothing but a non-white Chinese, non-exempt employee, that she should not have filed a housing discrimination complaint with HUD, that she should have accepted Bunting's permanent restraining order against her and that she should not have taken two hours of sick leave that morning. The following day, Tiernan issued plaintiff a counseling document because she had refused to accept the restraining order.  Tiernan wrote that Zhu had violated the use

of bank facility policy, even though he had never read the policy.  Plaintiff mailed Tiernan the policy and asserted that she had not violated it because she had notified her supervisor as soon as practical after she accessed the office after working hours.

On April 28, 2000, the Department of Housing and Urban Development ("HUD") acknowledged receipt of an FHA complaint in which Zhu alleged that Bunting had engaged in discriminatory housing practices.  The HUD complaint listed Zhu and her minor child, Ye Zhu, as aggrieved persons. Plaintiff asked Tiernan, McLelland and Workman, who was Human Resources Generalist, to write a statement for HUD. On September 20, 2000, McLelland and Workman, knowing that Zhu had engaged in activities protected by the FHA, conspired with Frank Lowman, who was President and CEO of FHLB-Topeka, to issue her an employment counseling document.

On May 4, 2001, Schaplowsky, First Vice President and General Counsel, knowing that Zhu had engaged in lawfully protected activities under the FHA, conspired with Bunting to intimidate, threaten or coerce Zhu to interfere with her rights under the FHA.  Schaplowsky e-mailed Zhu that because of a subpoena from Bunting, she was not to delete any records from her computer and that any action in contravention of his e-mail could result in her termination.  Zhu went to his office and complained that Bunting had engaged in housing discrimination against her.  Schaplowsky yelled at her, "You have no choice or option unless I advised you!" and asked her to leave.

On May 18, 2001, Zhu told Schaplowsky that she intended to seek a protective order and asked FHLB-Topeka not to produce the working documents on her computer.  After that, she was afraid to work on her computer at FHLB-Topeka because she feared that if she accidentally deleted a file, she might be fired.

On May 18, 2001, an attorney for Schaplowsky informed Zhu that FHLB-Topeka had reviewed all files on her computer.  The fax acknowledged that some files might be confidential and privileged, including Zhu's e-mail to her attorney which stated that she had submitted Title VII charge questionnaires to the Equal Employment Opportunity Commission on April 21, 2001.

On July 26, 2001, Tiernan conspired with officials and employees of FHLB-Topeka, including McLelland, Workman, Ma and Cox, to fire Zhu "on the spot" when she was going to attend a pretrial conference in federal court in Case No. 00-2290.  Cox handed Zhu a letter which stated that her employment was terminated and that her health insurance would terminate on July 31, 2001.   On August 12, 2001, Zhu sent Workman a letter alleging that FHLB-Topeka had discriminated and retaliated against her on the basis of race.  On September 4, 2001, Zhu sent  certified letters to Lowman, President and CEO, and Andy Jetter, Executive Vice President and Chief Operating Officer, requesting a grievance review.  FHLB-Topeka has not responded to either letter.  Lowman, Jetter and Workman conspired with officers of FHLB-Topeka to conceal discrimination and retaliation from the Kansas Human Rights Commission, the EEOC and the judiciary.

On October 10, 2001, Zhu sent a certified letter to Wente, Chairman of the Board of FHLB-Topeka.   The board of directors conspired with officers of the FHLB-Topeka to conceal discrimination and retaliation from the Kansas Human Rights Commission, the EEOC and the judiciary.

FHLB-Topeka Financial Operations/ Irregularities

Yardley, First Senior Vice President, and then Millburn, Vice President and Director of Internal Audit, gave Zhu the summary of investments which she used to perform the balance sheet

analysis and audit the Pinehurst model, a model developed by an FHLB employee.  Zhu occasionally found inaccuracies in the modeling results.  Furthermore, from time to time, Zhu found accounting discrepancies in the millions of dollars in the spreadsheets which Millburn and Martin provided.  She reported each discrepancy to McLelland.  For the bank's approximately $30 billion dollar balance sheet, the discrepancy limit was $1,000.  From the beginning of plaintiff's time at FHLB-Topeka, McLelland told Zhu to alter numbers to show a balanced spreadsheet.

On September 6, 2000, after Zhu began to document an accounting discrepancy in her balance sheet analysis, the Internal Audit Report for FHLB-Topeka's stated: "The spreadsheet used to prepare this balance indicated that an out-of-balance situation existed.  Amount on the spreadsheet was incorrectly changed to force the spreadsheet to balance."  On September 20, 2000, Workman and McLelland issued a counseling document to plaintiff.  The counseling document stated that an audit of the risk department noted that "Zhu had altered accounting numbers to make the duration spreadsheet balance because Zhu could not find the errors Zhu had made in transcribing numbers."  The document also stated that in October of 1998, McLelland had asked Zhu to "work much harder to find and correct this kind of simple transcription error in order to minimize just this kind of problem."  Workman and McLelland made this statement to affect plaintiff's employment status, injure her professional reputation and cover up accounting discrepancy problems.  Zhu responded that she had never altered accounting numbers to make any spreadsheets balance and that only at McLelland's suggestion or direction would she place a corrected figure on the balance sheet.  After receiving the counseling document Zhu insisted that McLelland provide written instructions to adjust any accounting discrepancy.

In December of 2000, Cox told Zhu that FHLB-Topeka had re-classified her position from exempt to non-exempt employee. She told Zhu that her job and responsibilities would not change, but that she would receive overtime if she worked more than 40 hours per week. This representation was false because Zhu has received no overtime. All employees with duties similar to Zhu's remained exempt. Zhu alleges that "the employment status of the classification of exempt entitled them not responsible for their mistake or errors including the accounting discrepancy problems." Amended Complaint (Doc. #72) ¶ 105.

On January 4, 2001, within one month of the change in Zhu's job classification, FHLB-Topeka posted a job vacancy for an exempt Risk Analyst. FHLB-Topeka hired Heather Gering, who was under 40 and had no related experience.

On February 26, 2001, Workman and Ma conspired to target Zhu for reporting accounting discrepancy problems which she had found in her balance sheet analysis. At Workman's direction, Ma "fraudulently" stated that Zhu needed to put more effort into balancing duration measurements on her balance sheet analysis. He stated that Zhu should define any problem before bringing it to others for help.

At several Interest Rate Management ("IRM") meetings, McLelland, Tiernan and Yardley discussed the fact that income forecast analyses made by Cindy Williams and Chris Shumaker were not accurate because they were 50 per cent higher than the monthly income for FHLB-Topeka. McLelland, Tiernan and Yardley did not record these discussions in written minutes because those minutes were reported to the board of directors of FHLB-Topeka. At one of the IRM meetings, Yardley instructed McLelland to omit from the minutes a $200 million material change in the bank's

financial condition.  In July of 2001, Zhu asked for McLelland's direction concerning a $10 million

discrepancy for June of 2001.  He responded that he would ask for Tiernan's instruction.  On July 25,

2001, Zhu again asked McLelland how to reconcile the $10 million discrepancy.  The next day, July

26, 2001, FHLB-Topeka terminated plaintiff's employment.

Shortly after Labor Day of 2001, David Mansfield, the information systems auditor for FHLB-

Topeka Internal Audit, called Zhu.  Mansfield told her that FHLB-Topeka had fired him because he

had sent a formal e-mail complaint against Millburn, director of Internal Audit, for refusing to

examine two months of work the day before.

RICO

From 1998 to 2001, Williams, Schumer, McLelland, Tiernan and Yardley executed a scheme

to defraud the member financial institutions of FHLB-Topeka by falsely estimating its income.

Specifically, to obtain monies and property of member institutions, they used a series of income

forecasts that they knew were 50 per cent higher than actual income.  Workman, Ma, McLelland, Cox

and Tiernan intentionally deceived member financial institutions and public investors as to

accounting discrepancies.  Yardley and McLelland willfully omitted from meeting minutes a $200

million income discrepancy.  Yardley, Tiernan, Cox, McLelland and others sold member financial

institutions a "New Product" from a newly-formed private company that was not subject to

accounting and financial restrictions and disclosures which were intended to protect investors.

Tiernan did not disclose to member financial institutions his own interest in selling "New Product."

Zhu informed Jetter of her belief that "New Product" sales were improper and that the lending

practice of adding larger margins to its small borrower member financial institutions was improper.

-13-

At the meeting on July 24, 2001, she also stated that if FHLB-Topeka increased its revenue ten per cent per year and paid its private owners seven to eight per cent per year, it was hard for employees to settle for a three to four per cent salary increase every year.

Zhu witnessed defendants' bank fraud and Tiernan, McLelland, Cox and Workman conspired to terminate her employment after she expressed concern about what she considered to be unlawful business practices.

FMLA

Since July 15, 1999, Zhu has regularly seen Dr. Jonathan M. Farrell-Higgins for treatment of post-traumatic stress disorder ("PTSD") which disrupted her sleep. On September 1, 1999, Zhu was injured in a car accident and told McLelland that she would use her sick leave, lunch time and vacation time for medical appointments. McLelland, who was plaintiff's immediate supervisor at the time, told her that she could work a flexible schedule. When Ma became plaintiff's supervisor, he allowed her to continue to work a flexible schedule.

On October 24, 2000 Zhu used sick leave for surgery. In December of 2000, McLelland warned Zhu that she had used all of her sick leave and vacation time for 2000. On April 12, 2001, Zhu took two hours of sick leave. The next day, Tiernan gave her a counseling document for taking sick leave and accused her of setting her hours arbitrarily to suit her needs. Other employees took sick leave and did not receive counseling documents. In May of 2001, McLelland and Ma told Zhu that she must work a fixed schedule from 7:30 a.m. to 4:30 a.m. Zhu requested a modified schedule, but FHLB-Topeka denied her request. FHLB-Topeka allowed Williams, a white female, to work a modified schedule to attend full-time college classes for four years. It also allowed female employees

in wire transfer to work modified schedules for four days per week.  On July 24, 2001, McLelland physically threatened Zhu and yelled at her for reporting to the workplace after 7:30 a.m.  Two days later, on July 26, 2001, FHLB-Topeka terminated plaintiff's employment.

Race, Sex And National Origin Discrimination

On several occasions beginning in December of 1997, Zhu answered incoming 800 calls from Debby (no last name) who asked to speak with Tiernan.  Zhu understood that Debby was Tiernan's friend and that Debby called him several times per day.  One day Tiernan announced loudly in front of 30 to 40 employees, "I have seen no one but Debby."

Between February and May of 1998, Tiernan pursued Zhu for a personal relationship. He told her that he wanted to take her out to eat, and on several occasions asked her to call him after work. Once, he put a few hundred dollar bills in a clear shirt pocket and spoke loudly or punched the desk next to hers to get her attention.  Zhu did not want to have a personal relationship with Tiernan.  He responded to her rejection by physically intimidating her.  Once, he stood by the door next to plaintiff's desk and yelled at her, in front of other employees, "What I suppose to do if I am frustrated and feel lonely!"  Zhu was afraid of working in such an environment.

On October 23, 1998, at Tiernan's request, McLelland told Zhu that her salary was too high and gave her a memo which stated that the bank expected a high level of performance because she had a Ph.D.   On October 31, 1998, Zhu confronted McLelland with a long list of her accomplishments. She asked why the bank had withdrawn a small increase in her pay and stated that she intended to participate in a "statutory proceeding."

In July, 2000, Williams became a risk analyst in charge of the FHLB-Topeka income estimation.  As her predecessor had done, Williams forecasted income unreasonably higher than actual income.  Williams sat next to Tiernan at every Rate Risk Management Committee meeting.  She held his hand on one occasion.  At another meeting, Tiernan watched Williams very closely while she was eating a piece of cake.  Amended Complaint (Doc. #72) ¶ 229.  Tiernan gave Williams favorable treatment in her employment, allowing her to set her own hours and attend a professional conference out of town.

On September 15, 2000, Williams yelled at Zhu because she had a Chinese accent and did not understand the American custom of "baby shower" gift-giving.  Williams told Zhu that she should "speak like us because you are living here."  Id. ¶ 168.  Zhu reported this to McLelland, who said that Williams owed her an apology.  Zhu sent Williams an e-mail which noted the bank's Mutual Respect Policy Statement.  On September 20, 2000, Workman and McLelland issued Zhu a counseling document for sending the e-mail.  The counseling document stated that by the end of the year, Zhu was to attend a class or undertake some other formal process to improve her written and spoken communication skills.  Zhu attached employee remarks that Washburn University offered an intensive English course, but that she could not enroll until January when the next semester started.  Zhu also noted that she had passed such a course at the University of Kansas more than ten years earlier.  She stated that she had completed advanced degrees in English and that she had defended her thesis in English before a panel of six professors. Zhu also noted her concern that she did not know a measurable standard for "noticeable improvement."

On August 9, 2000, Zhu had worked all night.  She was sitting at her computer at approximately 6:30 a.m. when Lowman, who was president and CEO of FHLB-Topeka, stepped into her office.  Zhu told him that Bunting had sexually assaulted her in her home, that she had filed a HUD complaint, that Bunting had filed a petition for a permanent restraining order and subjected her to criminal proceedings under Kansas trespass law, and that she was writing a pleading in that case. Lowman told her that he would arrange for her to speak with Cox and the general counsel for FHLB-Topeka.

Zhu felt that she had to fight for her right to drive on the highway to go to work and shop for food, and told Cox that she was afraid that she would be arrested for stalking Bunting when in truth Bunting was following her.  Cox e-mailed Zhu some attorney names, and McLelland told Zhu that Cox had told him to let her visit attorneys during the work day.  On September 20, 2000, McLelland issued Zhu the counseling document, described *supra*, for e-mailing Williams.  That document stated that "Mr. Lowman notices that you seem to be doing mostly legal work, the matter has to be addressed."  Id. ¶ 256.

In October of 2000, Zhu told Lowman that Williams had yelled at her for speaking English with a Chinese accent, and that McLelland had given Zhu a counseling document about plaintiff's e-mail to Williams concerning the incident.  Lowman told Zhu that he would "get rid of" McLelland and Williams.

At about 6:30 a.m. on January 6, 2001, Zhu was working at her computer when Lowman stepped into her office without clothing.  Zhu was shocked and fearful.

On February 8, 2001, Millburn e-mailed Zhu a summary of investments and asked her to let him know if she needed more information.[2]  This had been a routine procedure since the beginning of September of 2000.  Since that time, Zhu had contacted Millburn several times a month because she needed information.  On one occasion when she did so, Millburn asked Zhu to watch a movie after work because he was lonely.  She refused.  On two occasions in early 2001, McLelland yelled at her loudly, "Sue, don't bothering [Millburn]."  Id. ¶¶ 237-38.  On February 13, 2001, Zhu complained to Tiernan about McLelland's conduct.  Tiernan told her that Millburn had complained that she had bothered him.  Zhu then complained to Cox.  FHBL-Topeka did not investigate her complaints.

On February 26, 2001, FHLB-Topeka gave plaintiff an "adverse" annual evaluation which criticized her communication skills and suggested that "reading non-technical material (e. g., articles in Time or Newsweek) would help expand your understanding of written communication and your grasp of those cultural elements that play such a vital role in everyday conversation."  Id. ¶ 175.  Plaintiff understood this suggestion as a hostile racial comment because her supervisors knew that they had no communication problem with her and because Williams did not receive a similar requirement.

On March 9, 2001, FHLB-Topeka held a process meeting.  Williams stated that Zhu had not completed tasks as needed and had not renamed files as required.  McLelland yelled that Zhu had better admit what Williams alleged, and physically threatened Zhu.  After that meeting, McLelland

---

[2]      Beginning in September of 2000, FHLB-Topeka assigned Zhu to reconcile several spreadsheets.  Millburn gave Zhu the information for the summary of investments.  The accounting numbers and the summary of investments always contained discrepancies, many in the millions of dollars.  Zhu examined those numbers for her risk analysis.

yelled at Zhu more frequently.  On March 28, 2001, Zhu complained to supervisor Brian Dreher, as well as to Yardley and Tiernan, about McLelland's conduct.  Tiernan handled the complaint but did not take any action.

On April 12, 2001, after Zhu had taken two hours of sick leave, Tiernan called her into his office and told her that Lowman had seen her walking into the bank at 11:00 a.m. and told him to give her a counseling document.[3]  The following day, Tiernan called Zhu a "non-white Chinese" and gave her a counseling document which accused her of setting her own hours.  Amended Complaint, (Doc. #72) ¶75.  Zhu told Cox of the counseling document and accused Tiernan of discrimination and harassment.  Cox did not investigate or take remedial action.

On April 20, 2001, Zhu received a memorandum from Cox about her investigation of the incidents leading to the counseling document of April 13, 2001.

On April 21, 2001, Zhu submitted a charge questionnaire to the EEOC, alleging that FHLB-Topeka had discriminated against her on the basis of race, color, sex, national origin and disability.  On May 1, 2001, Zhu replied to Cox's memorandum of April 20 and stated that she believed that FHLB-Topeka had discriminated against her because of race, color, sex, national origin and disability.

On June 21, 2001, Zhu told McLelland and Cox that to comply with the counseling document of September 20, 2000, she proposed to attend Concord University Law School through distance learning.  Zhu asked the bank to pay tuition, as promised in the counseling document, but she has never received it.

---

[3]       The amended complaint states that the meetings occurred on April 12 and 13, 2000 and also on April 12 and 13, 2001.  Read in context, it appears that plaintiff intended to allege that these events occurred in 2001.

At a meeting on July 24, 2001, Cox stated that Jetter based his criteria for promoting women on "who bring him the most home baked cookies."[4]   Zhu then stated that although half of the 120 employees at FHLB-Topeka were women, 22 mangers were male and only 11 were female. Zhu told Jetter that she believed that she and other women employees were treated unfairly.

Age Discrimination

Shortly after FHLB-Topeka promoted Jetter to executive vice president and chief operating officer, Jetter stated that he would like to see some new young faces as employees. Soon thereafter, a publication of FHLB-Topeka stated that 24 per cent of the employees were "new and young people." Amended Complaint (Doc. #72) ¶ 277. When a young employee made a mistake one day, Ma attributed the mistake to computer delay and proposed that the bank buy the younger employee a faster computer. Further, the bank allowed Williams, who was outside the protected age group, to work a modified schedule to attend college as a full-time student for four years. It also allowed Williams to change her position frequently to suit her needs. The bank denied plaintiff's request for a modified schedule which she requested due to medical problems.

On June 7, 2001, Zhu requested that FHLB-Topeka consider her for opportunities to attend conferences, as every other employee in her department had attended conferences.

---

[4]        During plaintiff's tenure, FHLB-Topeka employed three employees with Ph.D. degrees, including Zhu and two male employees. Zhu earned substantially less than her two male counterparts. Zhu expressed concern to Cox that she was not given equal opportunity in the bank's promotion process. At some unspecified time, Zhu told Cox that she intended to participate in a statutory proceeding.

When FHLB-Topeka terminated her employment on July 26, 2001, Zhu was 47 years old. FHLB-Topeka retained other employees outside the protected age group even though their income estimates were never accurate.

<u>Administrative Remedies</u>

On January 18, 2002, Zhu submitted to the Kansas Human Rights Commission ("KHRC") an informal Complaint Information Sheet.  <u>See</u> <u>Memorandum In Support Of Topeka Defendant's Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction</u> (Doc. #87) filed February 15, 2005, Ex. C.  The information sheet mentioned possible claims for race, age and disability discrimination.  Zhu does not allege that this sheet was verified or that defendants received notice that she had submitted it to the KHRC.  Four days later, on January 22, 2002, Zhu filed a charge of sex and national origin discrimination with the KHRC.  The complaint was dual filed with the EEOC.  <u>See</u> <u>id.</u>, Ex. A.

On January 28, 2002, Zhu submitted to the EEOC an informal pre-charge questionnaire.  <u>See</u> <u>id.</u>, Ex. D.  This questionnaire mentioned possible claims for race, age and disability discrimination. Zhu does not allege (and the record does not reflect) that this questionnaire was verified or that defendants received notice that Zhu had submitted it to the EEOC.

On February 6, 2002, the EEOC notified Zhu that it would not investigate the claims in her pre-charge questionnaire of January 28, 2002 because the KHRC was investigating the case.  On September 30, 2002, in response to Zhu's charge of January 22, the EEOC issued Zhu a notice of right to sue.[5]  Zhu does not allege that after she received the letter of February 6, 2002, she

_____

[5]        Zhu alleges that she also filed an EEOC charge of discrimination in violation of
(continued...)

communicated with the KHRC or the EEOC about the claims which she had raised in her questionnaire of January 28.

Plaintiff's Claims

Liberally construed, plaintiff's amended complaint asserts the following claims against the various defendants:[6]

(1) Defendants discriminated on the basis of race in violation of 42 U.S.C. § 1981 (Count I(a)) and 42 U.S.C. § 1982 (Count I(b)) when they insisted that plaintiff accept the state court restraining order as a condition of her employment and terminated her employment to punish her for attempting to exercise rights under numerous civil rights statutes;[7]

(2) defendants violated 42 U.S.C. § 1985 (Count II(a)) and 42 U.S.C. § 1986 (Count II(b)) when they conspired to conceal the existence of race discrimination and segregation imposed by the state court restraining order;

(3) because of her race, defendants conspired to deprive plaintiff of access to public accommodations when they encouraged her to abide by the state court restraining order in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a et seq. (Count 3);

---

[5](...continued)
Title VII on April 21, 2001. Zhu does not assert that she ever received a notice of a right to sue on that charge, and she has not attached a copy of the charge to her complaint.

[6]    It is very difficult to ascertain from the amended complaint what particular claims plaintiff intends to assert against what particular defendants. Liberally construed, the amended complaint alleges each claim against each defendant. The facts alleged, however, would not support many of the claims against many of the defendants, particularly the individual defendants. In fact, plaintiff's response has abandoned many of her claims against the individual defendants.

[7]    Specifically, Count I alleges that defendants punished plaintiff "for exercising her rights and privilege secured by 42 U.S.C. §§ 1981, 1982, 1985, 1986, 3601-3619, 2000a, 2000a-1, and 2000a2." Amended Complaint (Doc. #72) ¶ 321.

(4) defendants conspired to interfere with plaintiff's housing rights by encouraging her to comply with the restraining order, which denied her access to public facilities, in violation of the FHA, 42 U.S.C. § 3601, et seq. (Count 4);

(5) defendants violated plaintiff's First Amendment right to free speech by discouraging her from – and ultimately terminating her for – discussing matters that cast the Federal Home Loan Bank system in a negative light (Count 5);[8]

(6) defendants made plaintiff's acceptance of the state court restraining order a condition of her employment, in violation of her rights to equal protection under the Fifth and Fourteenth Amendments (Count 6(a));

(7) defendants violated plaintiff's rights under the Thirteenth Amendment when they required her to comply with the state court restraining order (Count 6(b));

(8) defendants terminated plaintiff's employment in violation of 18 U.S.C. § 1514 A of the Sarbanes-Oxley Act because she gave her supervisors information concerning a $10 million accounting discrepancy at FHLB-Topeka (Count 7);

(9) defendants violated RICO, 18 U.S.C. §§ 1344, 1512-13, when they engaged in unspecified acts of racketeering which caused plaintiff's termination, damaged her professional reputation and interfered with her conduct of the Bunting case (Count 8);[9]

---

[8]     The Amended Complaint includes two separate headings titled "Count 4" but it appears that the second "Count 4" is intended to be combined with Count 5. See Amended Complaint (Doc. #72) at 98. The second Count 4 and Count 5 include allegations concerning the First Amendment and Section 1983. See id.

[9]     Count 7 does not specify any particular acts of rackeetering but incorporates 346 paragraphs of the amended complaint. See Amended Complaint (Doc. #72) ¶ 347.

(10) defendants refused plaintiff's request for the reasonable accommodation of a modified schedule and terminated her employment for refusing to comply with a 7:30 a.m. to 4:30 p.m. work schedule, in violation of the ADA, 42 U.S.C. §§ 12101 et seq. (Count 9a));

(11) defendants terminated plaintiff's employment for refusing to follow a 7:30 a.m. to 4:30 p.m. work schedule in violation of the FMLA, 29 U.S.C. §§ 2611 et seq. (Count 9(b));

(12) defendants violated the FLSA, 29 U.S.C. §§ 201 et seq. when they demoted plaintiff from exempt to non-exempt status but did not pay her overtime (Count 10(a));

(13) defendants willfully violated the EPA, 29 U.S.C. § 206(d), when they paid plaintiff less than males with Ph.D. degrees (Count 10(b));

(14) defendants terminated plaintiff's employment in retaliation for engaging in activity protected under the EPA, i.e. for complaining that FHLB-Topeka hired women for lower-paying jobs than men, in violation of 29 U.S.C. § 215(a)(3) (Count 10(c));

(15) defendants maintained a sexually hostile work environment in violation of Title VII, 42 U.S.C. § 2000e (Count 10 (d));[10]

(16) because of her sex, defendants terminated plaintiff's employment in violation of Title VII, 42 U.S.C. § 2000e (Count 10 (e));

(17) because of her race, defendants discriminated against plaintiff in the terms and conditions of her employment, in violation of Title VII, 42 U.S.C. § 2000e (Count 10(f));

---

[10]   The Amended Complaint actually includes two counts labeled "Count 10." The first Count 10 sets out FLSA and EPA claims. See Doc. #72 at ¶¶ 352-53. The second Count 10 sets out Title VII and ADEA claims. See id., ¶¶ 354 to 361.

(18) because of her national origin, defendants discriminated against plaintiff in the terms and conditions of her employment, including giving her a written reprimand on April 12, 2001, in violation of Title VII, 42 U.S.C. § 2000e (Count 10(g));

(19) defendants maintained a hostile work environment hostile based on plaintiff's national origin, in violation of Title VII, 42 U.S.C. § 2000e (Count 10(h));

(20) defendants retaliated against plaintiff for engaging in activity protected by Title VII by terminating her employment after plaintiff complained of race, sex and national origin discrimination, in violation of Title VII, 42 U.S.C. § 2000e (Count 10(i));

(21) defendants violated the ADEA, 29 U.S.C. § 621 et seq., by allowing employees outside the protected age group to use modified work schedules to attend college while not allowing plaintiff to do so, and terminating plaintiff's employment while retaining non-protected employees in similar positions (Count 10(j)).

### Legal Standards

#### Rule 12(b)(1) Subject Matter Jurisdiction

Courts may only exercise jurisdiction when specifically authorized to do so, see Castaneda v. INS, 23 F.3d 1576, 1580 (10th Cir. 1994), and must "dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." Scheideman v. Shawnee County Bd. of County Comm'rs, 895 F. Supp. 279, 280 (D. Kan. 1995) (citing Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)); Fed. R. Civ. P. 12(h)(3). Because federal courts are courts of limited jurisdiction, the law imposes a presumption against their jurisdiction. Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999). Plaintiff sustains the burden of

showing that jurisdiction is proper, see id., and she must demonstrate that the case should not be dismissed. See Jensen v. Johnson County Youth Baseball League, 838 F. Supp. 1437, 1439-40 (D. Kan. 1993). "Mere conclusory allegations of jurisdiction are not enough." Id.

The standards that apply to a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) are well settled. Such motions generally take the form of facial attacks on the complaint or factual attacks on the accuracy of its allegations. Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995) (citing Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)). When a party makes a facial attack, the Court must presume the factual accuracy of the complaint. As to these arguments the Court may not consider evidence outside the complaint. By contrast, if a party attacks the factual accuracy of the complaint, the Tenth Circuit has set out the following standard:

> [A] party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Holt, 46 F.3d at 1003 (citations omitted).

No matter how a jurisdictional issue is raised, "whenever it appears by the suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Basso, 495 F.2d at 910 (quoting Fed. R. Civ. P. 12(h)).

Rule 12(b)(6) Motion To Dismiss

-26-

A Rule 12(b)(6) motion should not be granted unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) (further quotations omitted). The Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from those facts in favor of plaintiff. See Shaw v. Valdez, 819 F.2d 965, 968 (10th Cir. 1987). In reviewing the sufficiency of plaintiff's complaint, the issue is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support her claims. Although plaintiff need not precisely state each element of her claims, she must plead minimal factual allegations on those material elements that must be proved. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). The Court affords a *pro se* plaintiff some leniency and must liberally construe the complaint. See Oltremari v. Kan. Soc. & Rehab. Serv., 871 F. Supp. 1331, 1333 (D. Kan. 1994). While *pro se* complaints are held to less stringent standards than pleadings drafted by lawyers, *pro se* litigants must follow the same procedural rules as other litigants. See Hughes v. Rowe, 449 U.S. 5, 9 (1980); Green v. Dorrell, 969 F.2d 915, 917 (10th Cir. 1992). The Court may not assume the role of advocate for a *pro se* litigant. See Hall, 935 F.2d at 1110.

**I.      Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction (Doc. # 86)**

As set out in more detail below, the Topeka defendants assert that the Court should dismiss portions of plaintiff's complaint under Fed. R. Civ. P. 12(b)(1) because the Court lacks subject matter jurisdiction over most of plaintiff's claims. Defendants assert that the Court only has jurisdiction over plaintiff's claims of sex and national original discrimination against FHLB-Topeka. Specifically, defendants assert that 1) the Court lacks subject matter jurisdiction over plaintiff's claims under the

Sarbanes-Oxley Act of 2002 because the statute was not in effect when plaintiff's claims arose and plaintiff did not exhaust administrative remedies under that statute; (2) under <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983), the Court lacks subject matter jurisdiction over all claims which allege that defendants in some way improperly influenced the outcome in a series of state court actions to which plaintiff was a party, including all of plaintiff's claims under the FHA, 42 U.S.C. §§ 1981, 1982, 1985 and 1986, and portions of her claims under Title VII, the ADA, the Rehabilitation Act, the ADEA, the FMLA and RICO; (3) plaintiff does not allege facts sufficient to establish standing to sue under the FHA, RICO, the ADA and 42 U.S.C. §§ 1981, 1982, 1985 and 1986, because she does not allege that she suffered concrete injury that fairly can be traced to the alleged actions of any defendant or that any defendant's actions invaded an interest of plaintiff's protected by these statutes; (4) the Court lacks subject matter jurisdiction over plaintiff's Title VII claims for race discrimination and retaliation, and plaintiff's ADEA and ADA claims, because she had not exhausted administrative remedies with respect to these claims; and (5) the Court lacks subject matter jurisdiction over all claims against the individual defendants under Title VII, the ADEA, the Rehabilitation Act and the ADA because plaintiff did not name them as respondents in the administrative charge which she filed with the EEOC and the KHRC and the individual defendants are not "employers" under these statutes.

As noted, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take two forms: facial attacks on the complaint and factual attacks on the accuracy of the allegations in the complaint. <u>See</u> <u>Holt</u>, 46 F.3d at 1002-03. Defendants assert that their motion falls within both categories. Defendants correctly characterize as facial attacks their arguments with respect to

Sarbanes-Oxley, the <u>Rooker-Feldman</u> doctrine and Article III standing.  As to these arguments the Court may not consider evidence outside the complaint.  Defendants assert that their remaining arguments – that the Court lacks jurisdiction over plaintiff's race, age, disability and retaliation claims, and discrimination claims against the individual defendants – are factual attacks on the accuracy of the complaint.  Defendants state that in challenging jurisdiction over plaintiff's race, age disability and retaliation claims over such claims, they rely on evidence outside the complaint, <u>i.e.</u> the KHRC charge, the KHRC complaint information sheet, the EEOC questionnaire and the right-to-sue letter.  These documents are incorporated by reference in the amended complaint, however, and the Court therefore deems these challenges to be facial attacks on the complaint.

### A.      **Sarbanes-Oxley**

Plaintiff attempts to state a cause of action under the Sarbanes-Oxley Act of 2002.  Although plaintiff does not cite any particular section of this statute, the only section which creates a cause of action for an employee of a regulated entity is the civil whistle-blower provision, 18 U.S.C. § 1514A.  This provision prohibits a company from discriminating against an employee in the terms and conditions of employment because of any lawful act done by the employee:

> to provide information, cause information to be provided, or otherwise assist in an investigation which the employee reasonably believes constitutes a violation of  .. . any rule or regulation of the Securities and Exchange Commission, or any provision of Federal Law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--
>> (A) a Federal regulatory or law enforcement agency;
>> (B) any Member of Congress or any committee of Congress; or
>> (C) a person with supervisory authority over the employee.

18 U.S.C. § 1514A(a)(1).

Before an employee can assert a cause of action in federal court under the Sarbanes-Oxley Act, he or she must file a complaint with the Occupational Safety and Health Administration ("OSHA") and afford OSHA the opportunity to resolve the allegations administratively.[11] 18 U.S.C. § 1514A(b)(1)(A). The administrative complaint must be filed "[w]ithin 90 days after an alleged violation of the Act" and include "a full statement of the acts and omissions, with pertinent dates, which are believed to constitute the violations." Id., § 1514A(b)(2)(D); 29 C.F.R. § 1980.103(b, d). If the employee meets these requirements for a particular violation, and a final administrative decision has not issued within 180 days of the filing, the employee can proceed with an action in federal court based on that violation. 18 U.S.C. § 1514A(b)(1)(B). See Willis v. Vie Fin. Group, Inc., 2004 WL 1774575, at *3 (E.D. Pa. Aug. 6, 2004).

Defendants assert that plaintiff cannot state a claim under Sarbanes-Oxley for two reasons. First, the Sarbanes-Oxley Act became effective July 30, 2002, and plaintiff bases her Sarbanes-Oxley claim on facts which occurred on or before July 26, 2001. The statute does not include a retroactive provision, and defendants argue that the Court should not apply it retroactively. See In re ADC Telecom., Inc. Sec. Litig. 409 F.3d 974, 977 (2d Cir. 2005) (refusing to retroactively apply 28 U.S.C. § 1658(b) of Sarbanes-Oxley Act to revive stale securities claims); Enter. Mortgage Acceptance Co., LLC, Sec. Litig. v. Enter. Mortgage Acceptance Co., 391 F.3d 401, 409-10 (2d Cir. 2004) (same); see also Martin v. Hadix, 527 U.S. 343, 352 (1999) (statutes generally presumed non-retroactive). This Court has found no case law specifically addressing whether 18 U.S.C. § 1514A is retroactive. Because of the 90-day exhaustion requirement, however, the Act could only provide relief for

---

[11]       The statute provides for filing the administrative complaint with the Secretary of Labor. The Secretary has delegated that responsibility to OSHA. See 29 C.F.R. § 1980.103(e).

conduct which occurred ninety days (or less) before the statute was enacted.  In any event, plaintiff does not allege that she exhausted her administrative remedies under Sarbanes-Oxley.  This Court therefore lacks jurisdiction over her claims under 18 U.S.C. § 1514A.  See Willis, 2004 WL 1774575 at *3.

## B.   Rooker-Feldman

Defendants next assert that this Court lacks subject matter jurisdiction over all claims which are based on plaintiff's assertion that the Third Judicial District Court of Kansas wrongfully issued a restraining order against her in Bunting v. Zhu, Case No. 00C579 ("Bunting").[12]  Under two related theories, plaintiff claims that defendants in this case, who were not parties to Bunting, violated 42 U.S.C. §§1981, 1982, 1985 and 1986, Title II, the FHA, and the ADA in relation to the Bunting case. First, plaintiff alleges that the Topeka defendants conspired with Bunting and his attorneys to interfere with her efforts to defend herself *pro se* against Bunting's trespass claim, thereby causing the state court to issue a restraining order which violated her federal rights.  See Amended Complaint (Doc # 72) ¶¶ 67, 71-75, 77-78, 81, 121, 123, 256.  Second, plaintiff alleges that although the Topeka defendants knew that the state court order was illegal, they coerced her to comply with it.[13]  Finally,

---

[12]    Defendants state that plaintiff also alleges that the Kansas district court incorrectly decided two other cases: Zhu v. Bunting, No. 00C665, aff'd, 30 Kan. App.2d xv, 40 P.3d 342 ( 2002), cert. den., 537 U.S. 887 (2002) and Zhu v. Lemon, Fisher, Kavanagh, Smith & Lemon, Case No. 00C714 (dismissed for failure to state claim), aff'd, 28 Kan. App. 2d xxx, 20 P.3d 98 (2001).  The amended complaint, however, does not cite these cases and centers almost entirely on the restraining order in Bunting v. Zhu, Case No. 00C579.

[13]    Defendants assert that Rooker-Feldman deprives this Court of jurisdiction to entertain any claim by plaintiff that they engaged in federal witness tampering under 18 U.S.C. §§ 1512 and 1513 – a RICO predicate offense – when they interfered with plaintiff's prosecution of a state court case against Bunting.  The complaint, however, does not appear to allege witness tampering in
(continued...)

plaintiff alleges that the Topeka defendants terminated her employment because she did not agree that the restraining order was legal.

1.    Interference With Plaintiff's *Pro Se* Defense Of Bunting Case

Defendants argue that plaintiff cannot recover for interference with her *pro se* efforts to defend the Bunting trespass case unless this Court finds that the state court wrongly entered the restraining order against her, and that Rooker-Feldman deprives this Court of jurisdiction to make such a finding. Defendants also argue that Rooker-Feldman bars any claim that the state court entered an erroneous judgment because the parties there committed fraud on the court or conspired to deny plaintiff fair access to that court. See, e.g., Van Sickle v. Holloway, 791 F.2d 1431, 1436 (10th Cir. 1986); Weaver v. Boyles, 172 F. Supp.2d 1333, 1336 (D. Kan. 2001) aff'd, 26 Fed. Appx. 908, 2002 WL 220590 (10th Cir. Feb. 13, 2002); see also Crestview Vill. Apts. v. U.S. Dept. of Housing & Urban Dev., 383 F.3d 552, 556 (7th Cir. 2004); Johnson v City of Shorewood, 360 F.3d 810, 818-19 (8th Cir. 2004). Defendants point to Bisbee v. McCarty, 3 Fed. Appx. 819, 822-823, 2001 WL 91411 (10th Cir. Feb. 2, 2001), in which the Tenth Circuit explained the scope of the Rooker-Feldman doctrine as follows:

> The Rooker-Feldman doctrine provides that federal courts, other than the United
> States Supreme Court, lack jurisdiction to adjudicate claims seeking review of state
> court judgments. See Feldman, 460 U.S. at 486; Rooker, 263 U.S. at 415-16. The
> losing party in a state court proceeding is generally "barred from seeking what in
> substance would be appellate review of the state court judgment in a United States
> district court, based on the losing party's claim that the state judgment itself violates

---

[13](...continued)
connection with any state court case. Rather, as a predicate offense under RICO, plaintiff alleges that "defendants know that plaintiff is a witness of their violations of 18 U.S.C. § 1344." In any event, because the Court dismisses the RICO claim on other grounds, it does not decide the Rooker-Feldman issue as to the RICO claims.

the loser' federal rights." Johnson v. De Grandy, 512 U.S. 997, 1005-06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). Review of the state court judgment must proceed to the state's highest court and then to the United States Supreme Court pursuant to 28 U.S.C. § 1257. See Facio v. Jones, 929 F.2d 541, 543 (10th Cir. 1991).

Rooker-Feldman bars not only cases seeking direct review of state court judgments; it also bars cases that are "inextricably intertwined" with a prior state court judgment. See Feldman, 460 U.S. at 482 n.16. If adjudication of a claim in federal court would require the court to determine that a state court judgment was erroneously entered or was void, the claim is inextricably intertwined with the merits of the state court judgment. See Jordahl v. Democratic Party of Va., 122 F.3d 192, 202 (4th Cir. 1997). "[T]he fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." Garry v. Geils, 82 F.3d 1362, 1365 (7th Cir. 1996).

Id. After the Topeka defendants filed their motion to dismiss, the Supreme Court addressed the Rooker-Feldman doctrine, stating that it "has sometimes been construed to extend far beyond the contours of the Rooker and Feldman cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." Exxon Mobil Corp. v. Saudi Basic Indus. Corp. 125 S. Ct. 1517, 1521 (2005). The Supreme Court therefore confined the Rooker-Feldman doctrine "to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 1521-22. In other words, precisely the circumstances involved in this case.

Because Rooker-Feldman deprives the Court of subject matter jurisdiction over claims that plaintiff sustained injuries on account of the state court restraining order, this Court lacks jurisdiction over plaintiff's claims under Title II, the FHA and 42 U.S.C. §§ 1982, 1985 and 1986 – claims which

entirely depend on plaintiff's assertion that she sustained injury because some aspect of <u>Bunting</u> was wrongly decided.

                2.        <u>Coercion To Comply With Illegal Restraining Order</u>

Defendants assert that <u>Rooker-Feldman</u> bars any Title VII, ADA or ADEA claim that defendants discriminated against plaintiff when they encouraged her to comply with the state court restraining order or made it a condition of her employment.  Plaintiff actually brings such claims under the FHA and 42 U.S.C. §§ 1982, 1985 and 1986.  Plaintiff's claims under Title VII,[14] the ADA[15] and the ADEA[16] do not mention the restraining order and are based on other allegations of discrimination, as set out *infra* at 23-24.  Accordingly, the Court need not address this aspect of defendants' motion.

                3.        <u>Termination Of Plaintiff's Employment Because She Did Not Agree That The Restraining Order Was Legal</u>

As to Section 1981, plaintiff alleges that defendants terminated her employment on the basis of race because she did not agree that the state court restraining order was legal.  Termination of her employment constitutes an injury which is distinct from the state court order itself.  Thus <u>Rooker-Feldman</u> does not bar plaintiff's Section 1981 claim.

**C.**        **<u>Standing To Sue Under The FHA, RICO, 42 U.S.C. §§ 1981, 1982, 1985 and 1986</u>**

Defendants assert that plaintiff lacks standing to sue under Title II, the FHA, RICO and 42 U.S.C. §§ 1981, 1982, 1985 and 1986.  The Court has already found that <u>Rooker-Feldman</u> bars

---

[14]    <u>See</u> Counts 10(c) through 10(i), Amended Complaint.

[15]    <u>See</u> Count 9(a), Amended Complaint.

[16]    <u>See</u> Count 10(j) Amended Complaint.

plaintiff's claims under Title II, the FHA, Sections 1982, 1985 and 1986.  The Court therefore will address defendants' standing arguments only as to plaintiff's claims under Section 1981 and RICO.

Article III of the Constitution limits access to the federal courts to those who have standing to sue, which requires (1) an injury in fact to an interest protected by federal law; (2) a causal relationship between the injury and defendants' challenged conduct; and (3) the likelihood that the injury will be redressed by a favorable decision.  See Wilson v. Glenwood Intermountain Props., 98 F.3d 590, 593 (10th Cir. 1996) (FHA case); Cache Valley Elec. Co. v. State of Utah Dep't of Transp., 149 F.3d 1119, 1122 (10th Cir. 1998).  Defendants assert that plaintiff has not alleged any of the three standing requirements as to her claims under RICO or Section 1981.

### 1.    Standing Under RICO

Under RICO, plaintiff alleges that the Topeka defendants injured her by (1) causing the termination of her employment, (2) damaging her professional reputation in the process of terminating her employment and (3) interfering with her defense of the Bunting case, leading to an unjust result. Defendants argue that plaintiff's RICO claim fails because her three alleged RICO injuries are not "injuries in fact" under Cache Valley.

The termination of employment is not an act of racketeering under RICO, so a former employee lacks standing to sue for wrongful termination under RICO.  Beck v. Prupis, 529 U.S. 494, 500-04 (2000) (termination of employment not act of racketeering and does not confer standing to sue under RICO, even when plaintiff terminated in retaliation for reporting RICO offenses to proper authorities).  For the same reasons, plaintiff's allegation of damage to her reputation in the process of termination of her employment fails to confer standing under RICO.  While plaintiff generally

alleges that the defendants "tempered" her professional reputation and caused "damages to her professional reputation" in terminating her employment, she does not suggest that this alleged reputational damage constituted a "concrete and particularized" injury to a legal interest protected by RICO.  As defendants point out, if RICO does not protect an interest in employment itself, damage to reputation which results from the termination of employment cannot confer standing under RICO. Cf. Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1267-69 (10th Cir. 1989) (damage to reputation affecting prospective employment relationships "too insubstantial" to confer standing under various federal statutes); Sadighi v. Daghighfekr, 36 F. Supp.2d 279, 288-89 (D.S.C. 1999) (suggesting plaintiff could establish RICO standing if he alleged injury due to having name associated with wire fraud). The Court finds that plaintiff lacks standing to assert her RICO claims.

2.      Standing Under 42 U.S.C. § 1981

Defendants assert that plaintiff has not alleged injury in fact under 42 U.S.C. § 1981, which requires that plaintiff allege that because of race, defendants deprived her of one of four protected interests: (1) the right to make and enforce contracts; (2) the right to sue, be a party and give evidence; (3) the right to the full and equal benefit of the laws; and (4) the right to be subjected to the same "pains and punishments" as white persons.  Phelps, 886 F.2d at 1267.  Defendants assert that plaintiff therefore lacks standing to sue these defendants under Section 1981.  Liberally construed, however, the amended complaint alleges that because of her race, defendants terminated her employment because she opposed the restraining order and did not agree that it was lawful.  This alleged conduct implicates plaintiff's right to make and enforce contracts, and plaintiff therefore has alleged injury in fact under Section 1981.

Defendants also assert that plaintiff lacks standing to assert her Section 1981 claim because she has not alleged a causal relationship between the injury and defendants' challenged conduct. This prong requires that plaintiff show that "the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court." Cache Valley, 149 F.3d at 1122. Defendants argue that plaintiff's alleged damages under Section 1981 flow directly from the actions of Bunting, other employees at Countrywide Realty, and the Third Judicial District Court of Kansas, not from them. Defendants ignore plaintiff's allegations that they retaliated against her – by harassing her at work and ultimately firing her – because she opposed the restraining order. Plaintiff's claimed injuries are traceable to defendants' conduct.

Finally, defendants argue that plaintiff has no prospect of obtaining relief from the injury as a result of a favorable ruling. Defendants argue that plaintiff has no prospect of obtaining relief from the Topeka defendants for any violations of 42 U.S.C. § 1981. Defendants' argument in this regard appears to be that plaintiff has not set forth a claim under Section 1981. Because defendants have not specifically addressed the individual statutory claim, however, the Court is not in a position to rule whether plaintiff has stated a claim. Defendants have not convinced the Court that plaintiff lacks standing to raise her claim under Section 1981.

### D.  Failure to Exhaust Administrative Remedies As To Title VII, ADA and ADEA Claims

Defendants argue that the Court lacks jurisdiction over most of plaintiff's discrimination claims because she has not exhausted administrative remedies. Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Exhaustion of administrative

-37-

remedies is also a jurisdictional prerequisite to suit under the ADA, see McBride v. Citgo Petroleum Corp., 281 F.3d 1099, 1105 (10th Cir. 2002) and the ADEA, see Creason v. Seaboard Corp., 263 F. Supp.2d 1297, 1309 (D. Kan. 2003).

To exhaust administrative remedies, a plaintiff generally must present her claims to the EEOC or authorized state agency (in Kansas, the KHRC) as part of her timely filed administrative EEOC charge and receive a right-to-sue letter based on that charge. Simms, 165 F.3d at 1326; see also Jones v. Runyon, 91 F.3d 1398, 1399-1400 (10th Cir. 1996). The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b). The charge tells the EEOC or KHRC what to investigate, provides it the opportunity to conciliate the claim, and gives the charged party notice of the alleged violation. Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997). The requirement to present claims in an EEOC or state agency charge as a prerequisite to bringing suit serves the dual purposes of ensuring the administrative agency has the opportunity to investigate and conciliate the claims and of providing notice to the charged party of the claims against it. See id.; Bland v. K.C.K. Cmty. Coll., 271 F. Supp.2d 1280, 1283 (D. Kan. 2003); cf. Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989) (allowing complaint to encompass allegations outside ambit of predicate EEOC charge would circumvent EEOC's investigatory and conciliatory role and deprive charged party of notice of charge, as would initial failure to file timely EEOC charge). Plaintiff must have raised before the EEOC or KHRC every issue she now brings, or any additional claim must be "reasonably related" to the claims that she did bring before the EEOC.

See Jones v. Denver Post Corp., 203 F.3d 748, 755 (10th Cir. 2000) (citing Aramburu v. Boeing Co., 112 F.3d 1398, 1409 (10th Cir. 1997)).

Defendants assert that plaintiff's KHRC charge did not allege any race, age or disability discrimination or retaliation, and that this Court thus has no jurisdiction over these claims. On January 22, 2002, plaintiff filed with the KHRC her only administrative charge against FHLB-Topeka, docket number 26297-02. The charge, which was dual filed with EEOC on the same day, alleged only sex and national origin discrimination. The sex discrimination charge was based on (1) a single incident of sexual harassment which allegedly occurred on January 6, 2001 and (2) plaintiff's termination on July 26, 2001. The national origin discrimination charge was based on (1) a reprimand on April 13, 2001, and (2) plaintiff's termination on July 26, 2001. The administrative charge did not allege race, age or disability discrimination or retaliation. On September 30, 2002, the EEOC issued plaintiff a notice of right to sue in response to the KHRC charge dated January 22, 2002.

Because plaintiff's administrative charge did not include any charges of race, age or disability discrimination or retaliation for engaging in protected activity, defendants argue that plaintiff has completely failed to exhaust administrative remedies with regard to those claims under Title VII, the ADA and the ADEA. Cf. Zartman v. Coffey County Hosp., No. 03-2567, 2004 WL 877667 (D. Kan. Apr. 22, 2004); see also Seymore, 111 F.3d at 799 (where retaliatory act occurs before filing of charge and employee fails to allege retaliatory act or retaliation claim in subsequent charge, retaliatory act ordinarily will not reasonably relate to charge). Plaintiff responds that she did not intend to state claims against any of the individual Topeka defendants under Title VII, the ADEA, the ADA or the

Rehabilitation Act.  See Plaintiff's Subject Matter Jurisdiction Brief at 16.  The Court therefore finds that these claims should be dismissed.

As for plaintiff's claims against FHLB-Topeka, plaintiff asserts that she has exhausted administrative remedies on all of her discrimination claims.  Plaintiff relies upon the "Complaint Information Sheet" which she submitted to the KHRC on January 18, 2002, where she checked boxes for possible claims of race, age and disability discrimination and upon the pre-charge questionnaire which she submitted to the EEOC on January 28, 2002, where she also checked a box for retaliation.[17] FHLB-Topeka argues that these questionnaires do not satisfy the jurisdictional administrative filing requirement.

The KHRC "Complaint Information Sheet" does not constitute a "complaint" under state law. The Kansas Acts Against Discrimination, K.S.A. § 44-1001 et seq. ("KAAD"), and its implementing regulations, require a complaint to be signed by the complainant, formally filed with the KHRC as a complaint, and verified under oath.  K.S.A. § 44-1005(a), K.A.R. §§ 21-40-1(i), 21-41-1(a), and 21-41-2.  Plaintiff's "Complaint Information Sheet" was not verified under oath, and states in its caption that it is submitted "for information purposes only."  See Memorandum In Support Of Topeka Defendant's Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction (Doc. #87) filed February 15, 2005, Exhibit C.  Kansas law requires the KHRC to serve a copy of the complaint upon each party alleged to have violated the KAAD within seven days after the complaint is filed.  K.S.A.§ 44-1005(d); K.A.R. § 21-41-11.  Once the formal complaint is served on the parties, the KHRC investigation is governed by the "allegations of the complaint."

_____

[17]     Plaintiff also asserts that she submitted a "charge questionnaire" to the EEOC on April 21, 2001, but she has not attached a copy of that questionnaire.

K.S.A. § 44-1005(d). Plaintiff has not alleged that her "Complaint Information Sheet" was served on FHLB-Topeka at any time before she filed it as an attachment to her brief in opposition to defendants' motions to dismiss her original complaint.

FHLB-Topeka asserts that under Tenth Circuit law, intake forms – such as the ones which plaintiff submitted to the KHRC on January 18, 2002 and the EEOC on January 28, 2002 – do not satisfy administrative exhaustion requirements. See Welsh v. City of Shawnee, 182 F.3d 934, 1999 WL 345597 at *5-6 (10th Cir. 1999) (where charges in EEOC complaint information sheet omitted from later-filed formal charge, administrative remedies generally exhausted only as to allegations in formal charge). Exceptions include when "plaintiff is able to demonstrate that she intended the EEOC to investigate the allegations not included in the formal charge" and the EEOC was negligent in not including them in it. Id.. at *5 ("[t]here is a difference between making allegations of an individual's improper conduct, even in writing, and asserting formal charges under oath . . . regarding that conduct"); see Bland, 271 F. Supp.2d 1280, 1284 n.1, 1285 (D. Kan. 2003) (unverified, unsigned intake questionnaire does not satisfy exhaustion requirement, particularly in light of subsequently filed, more limited formal charge). Plaintiff's formal complaint of January 22, 2002 superceded her KHRC information sheet of January 18, 2002 and plaintiff does not allege that KHRC staff was negligent in preparing her formal complaint or that she lacked an opportunity to correct that complaint to include all charges contained in the information sheet. The KHRC complaint information sheet does not satisfy the administrative exhaustion requirements under Title VII, the ADA or the ADEA.[18]

---

[18]     Although some circuits have allowed pre-charge documents to serve as formal charges for purposes of exhaustion or timeliness requirements, plaintiff does not allege facts which would support such treatment here. Cf. Diez v. Minn. Mining & Mfg. Co., 88 F.3d 672, 675-76 (8th

(continued...)

See McCall v. Bd. of Comm'rs of Shawnee County, 291 F. Supp.2d 1216, 1222-23 (D. Kan. 2003);

Williams v. Prison Health Servs., Inc., 159 F. Supp.2d 1301, 1311-13 (D. Kan. 2001).

Plaintiff also relies upon her EEOC complaint information sheet of January 28, 2002, which she submitted after she filed her formal charge. On February 6, 2002, the EEOC informed plaintiff that because she had already filed her charge with KHRC, the EEOC would not simultaneously review it. Thus, plaintiff was on notice that the EEOC would not investigate the allegations in her complaint information sheet and that she needed to contact the KHRC about them. Plaintiff does not allege she had any further contact about the substance of her complaint information sheet of January 28, 2002 with either the KHRC or the EEOC. That sheet never became an amendment to the formal complaint of January 22, 2002 or a separate formal complaint, and FHLB-Topeka never received notice that plaintiff had submitted it to the EEOC.

FHLB-Topeka points out that although EEOC regulations permit complainants to file unverified documents as amendments to a previously filed formal charge, such amendments are proper only if intended to "1) correct technical defects or omissions; 2) clarify or amplify allegations made in the original charge; or 3) add additional Title VII violations related to or growing out of the

---

[18](...continued)
Cir. 1996) (when EEOC or FEP agency treats pre-charge document as complaint, notifies employer of it and acts on it, pre-charge document sufficient); B.K.B. v. Maui Police Dep't, 276 F.3d 1091 (9th Cir. 2002) (where plaintiff shows that some charges stated in pre-charge document were excluded from formal charge through agency negligence, pre-charge document sufficient); Lawrence v. Cooper Cmtys., Inc., 132 F.3d 447 (8th Cir. 1998) (where EEOC misled plaintiff into believing that submission of timely pre-charge document with subsequent verification would suffice, pre-charge document sufficient). Plaintiff has not alleged that such circumstances are present in this case. Where plaintiff is aware of facts supporting a discrimination claim on the day she files her EEOC complaint, yet fails to include that claim in her complaint, she may not later assert that claim in court. See Seymore, 111 F.3d at 799-800 (attempt to add retaliation claim rejected); Simms, 165 F.3d at 1327 (10th Cir. 1999) (same).

subject matter of the original charge." Simms, 165 F.3d at 1326; Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2nd Cir. 2001); 29 C.F.R. §§ 1601.12(b) and 1626.8.  An amendment to an EEOC charge may not add a completely new theory, because a central purpose of the administrative filing requirement is to give the employer notice and opportunity for administrative investigation and conciliation. Manning v. Chevron Chem. Co., 332 F.3d 874, 878-89 (5th Cir. 2003) (citing Simms, 165 F.3d at 1327).

    In response to defendants' motion, plaintiff argues that she used internal complaint procedures at FHLB-Topeka by complaining to FHLB-Topeka officials about discrimination.  For example, on March 28, 2001, she complained to Dreher, Yardley and Tiernan about McLelland's conduct.  Plaintiff asserts that these complaints constituted exhaustion of administrative remedies and asserts that pursuant to its internal complaint procedures, FHLB-Topeka had a duty to provide forms to file KHRC or EEOC complaints.  Plaintiff suggests that defendants should be estopped from asserting failure to exhaust.  Defendants correctly note, however, that an employee's attempt to use internal grievance procedures does not toll the time to file an EEOC charge.  See Del. State Coll. v. Ricks, 449 U.S. 250, 260-61 (1980).

    For the foregoing reasons, the Court finds that plaintiff has not exhausted administrative remedies as to her claims of race discrimination and retaliation under Title VII, and her ADA and ADEA claims. The Court therefore dismisses those claims for lack of subject matter jurisdiction. Simms, 165 F.3d at 1326 (failure to exhaust is jurisdictional bar to Title VII claims); McBride, 281 F.3d at 1105 (same as to ADA), Creason, 263 F. Supp.2d at 1309 (same as to ADEA).  The Court has subject matter jurisdiction over the discrimination claims which plaintiff asserted against FHLB-

Topeka in her formal KHRC complaint—that is, Title VII discrimination based on sex and national origin.  As noted above, the Court dismisses all Title VII, ADA, ADEA and Rehabilitation Act claims against the individual defendants because plaintiff has stated that she did not intend to bring such actions against them.[19]

## II.   Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint For Failure To State A Claim

Under Rule 12(b)(6), the Topeka defendants ask the Court to dismiss plaintiff's claims under Section 1983, the First, Fifth, Thirteenth and Fourteenth Amendments, the sex and national origin discrimination provisions of Title VII, the Rehabilitation Act, the ADA, the FMLA, the FLSA, the EPA, and RICO.

### A.   Section 1983 Or Bivens Claims For Violations Of Constitutional Rights Under The First, Fifth, Thirteenth And Fourteenth Amendments

---

[19]   Plaintiff's KHRC/EEOC charge did not name any individual defendants as respondents.  As a general rule, a plaintiff must file an EEOC charge against a party before she can sue that party under Title VII.  Bratton v. Bethlehem Steel Corp., 649 F.2d 658, 666 (9th Cir. 1980) (plaintiff who only included employer in EEOC charge not permitted to add union to lawsuit).  Plaintiff does not allege that the individual defendants received notice of the administrative charge or opportunity to participate in the investigation and conciliation of her claims.  Moreover, Title VII does not create individual liability for persons who are not "employers."  Haynes v. Williams, 88 F.3d 898 (10th Cir. 1996).  Likewise, neither the ADA nor the ADEA creates individual liability for persons who are not "employers."  Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999).  The Rehabilitation Act regulates only federal agencies, state and local government agencies which receive federal funds, and private "employers" which receive federal funds for specified purposes. 29 U.S.C. §§ 791(b)-(e), 793(a), 794(a) & 794(b).  Plaintiff has not alleged that any individual defendants are "employers" or regulated entities for purposes of these Acts.  Therefore, the Court lacks subject matter jurisdiction over all of plaintiff's Title VII, ADA, ADEA and Rehabilitation Act claims against the individual defendants.

Plaintiff alleges in conclusory terms that the Topeka defendants violated her rights under the First, Fifth, Thirteenth and Fourteenth Amendments, and seeks to bring these claims under 42 U.S.C. § 1983.

    1.    <u>Section 1983</u>

42 U.S.C. Section 1983 provides a cause of action against persons in their individual capacities acting under color of state law. <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985). To the extent that plaintiff seeks to hold defendants liable under Section 1983 for violating her constitutional rights, defendants point out that plaintiff has not alleged that any defendant was a state actor or acted under color of state law. <u>See, e.g.</u>, <u>Gillespie v. Civiletti</u>, 629 F.2d 637 (9th Cir. 1980).

The only possible suggestion that any defendant was a state actor or acted under color of state law is plaintiff's allegation that defendants conspired with Bunting and his attorneys to deprive her of her rights in a state court proceeding. For a private individual's conduct to constitute state action, it must be "fairly attributable to the state," meaning that at a minium, "the private party must have acted together with or obtained significant aid from State officials or engaged in conduct otherwise chargeable to the State." <u>Scott v. Hern</u>, 216 F.3d 897, 906 (10th Cir. 2000). As defendants point out, the only state government involvement which plaintiff alleges in this case is that the state court entered a protective order in Bunting's suit against her. Bunting's conduct in bringing that suit is not state action, <u>see id.</u> (private individual does not engage in state action merely by availing self of state procedure), and any conduct by defendants to assist Bunting or hinder plaintiff in the state court proceeding did not render them state actors. <u>Cf.</u> <u>Zhu v. Fisher, Cavanaugh, Smith & Lemon, P.A.</u>, 151 F. Supp.2d 1254, 1258 (D. Kan. 2001) (no § 1983 cause of action against Bunting's attorneys).

Further, plaintiff's suggestion that the Topeka defendants are subject to Section 1983 because FHLB-Topeka was a federal instrumentality is incorrect. Section 1983 creates a cause of action only against state actors, not federal agents or private persons who act at the behest of the federal government. See Van Sickle v. Holloway, 791 F.2d 1431, 1436 n.4 (10th Cir. 1986). Therefore, neither FHLB-Topeka nor any individual defendant is a state actor amenable to suit under 42 U.S.C. § 1983. The Court finds that those claims should be dismissed.

2.    Bivens

Plaintiff's claim that the Topeka defendants violated her rights under the First, Fifth, Thirteenth and Fourteenth Amendments may be construed to raise claims under Bivens v. Six Unknown Named Agents Of The FBI, 403 U.S. 388 (1971), if not Section 1983. In Bivens, the United States Supreme Court recognized an implied private remedy for damages for violation of the Fourth Amendment by "a federal agent acting under color of his authority." Id. at 389. The Supreme Court later extended Bivens to provide a damages remedy for violation of the Fifth Amendment Due Process Clause, see Davis v. Passman, 442 U.S. 228 (1979), and violation of the guarantee against cruel and unusual punishment under the Eighth Amendment, see Carlson v. Green, 446 U.S. 14 (1980). In Carlson, the Supreme Court stated that "Bivens established that victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." Id. at 18.

Plaintiff alleges that the Topeka defendants violated plaintiff's First Amendment rights by discouraging her from publicly discussing certain matters that might cast FHLB-Topeka in a negative light, thereby chilling her freedom of speech, and ultimately terminating her employment in retaliation

for complaints about such matters.  Construed liberally, the complaint also alleges that the Topeka defendants violated plaintiff's rights to equal protection under the Fifth and Fourteenth Amendments by retaliating against her for filing a fair housing complaint against Bunting and Countrywide Realty Co.  Plaintiff specifically alleges that FHLB-Topeka and the individual defendants acted as a federal instrumentality or agent under color of the laws and regulations of the Federal Home Loan Bank Act.  The Topeka defendants ask the Court to dismiss plaintiff's First, Fifth and Fourteenth Amendment claims, asserting that they are not "federal actors" for purposes of Bivens.

A corporate entity qualifies as a federal actor "only if (1) the government created the corporate entity by special law, (2) the government created the entity to further governmental objectives, and (3) the government retains permanent authority to appoint a majority of the directors of the corporation." Lebron v. Nat'l RR Passenger Corp., 513 U.S. 374 (1995); Horvath v. Westport Library Ass'n, 362 F.3d 147, 153 (2nd Cir. 2004) (public library corporation operated by board of directors, half of which were government-appointed, not government actor); Hall v. Am. Nat'l Red Cross, 86 F.3d 919, 921-922 (9th Cir. 1996) (Red Cross not government actor for First Amendment purposes because only eight of 42 directors appointed by federal government); Am. Bankers Mortgage v. Fed. Home Loan Mortgage Corp., 75 F.3d 1401, 1407-08 (9th Cir. 1996) (Freddie Mac not government actor for Fifth Amendment purposes because only five of 18 board members appointed by federal government).  Here, although Congress created the Federal Home Loan Banks to further federal governmental objectives, the government appoints only six of the 14 directors for each regional bank such as FHLB-Topeka.  See 12 U.S.C. § 1427(a) (shareholders elect other eight directors).  FHLB-Topeka is not a federal actor.

Plaintiff asserts that because they are officers or employees of FHLB-Topeka, the individual defendants are federal actors. Because FHLB-Topeka is not a federal actor, its officers and employees are not federal actors. The Court finds that plaintiff's First, Fifth, and Fourteenth Amendment claims against the Topeka defendants must be dismissed for failure to state a claim.

3.   Thirteenth Amendment

Plaintiff claims that defendants violated her rights under the Thirteenth Amendment when they required her to comply with the state court injunction. The Thirteenth Amendment relates only to slavery and involuntary servitude "akin to African slavery," that is, to situations in which "the victim had no choice but to work or be subject to legal sanction." United States v. Kozminski, 487 U.S. 931, 942-43 (1988). Plaintiff has made no such allegations in this case, and the Court finds that her Thirteenth Amendment claim should therefore be dismissed.[20]

B.   **Title VII Sex And National Origin Claims**

Generally, plaintiff claims that defendants violated Title VI by discriminating against her on the basis of race, sex and national origin and they retaliating against her because she engaged in protected activity. As set out in Part I above, the Court lacks subject matter jurisdiction over plaintiff's race discrimination and retaliation claims. Furthermore, to the extent that the complaint asserted Title VII claims against the individual Topeka defendants, plaintiff has abandoned those claims. Plaintiff's remaining claims are for sex and national origin discrimination against FHLB-

---

[20]   The rights contained in the Thirteenth Amendment and the right to interstate travel are the only civil rights which plaintiff can enforce against a purely private defendant. Bray, 506 U.S. at 315.

Topeka, which asks the Court to dismiss those claims because they do not state a claim on which relief can be granted.

Plaintiff claims that defendant subjected her to a work environment which was hostile on account of her sex and national origin, and subjected her to disparate treatment based on sex and national origin. Specifically, plaintiff bases her claim of sexual harassment on allegations that (a) from February to May 1998, Tiernan, who was a senior vice president, pursued plaintiff for a personal relationship; (b) from late 2000 to February of 2001, Millburn, who was a vice president, pursued a personal relationship with plaintiff; (c) on January 6, 2001, Lowman, who was president and CEO, stepped into plaintiff's office without any clothing; (d) on April 13, 2001, FHLB-Topeka issued plaintiff a counseling document because she had rejected Lowman's advances; and (e) on July 26, 2001 defendant fired her in part because she had rejected Lowman's advances.  Plaintiff's sex discrimination claim is based on her termination on July 26, 2001.  Her national origin hostile work environment claim is based on several incidents including (a) an April 12, 2001 work assignment with an unreasonable deadline; (b) defendant's reprimand of plaintiff on April 13, 2001 for complaining about conduct of other employees and for arbitrarily setting her own work hours; and (c) on April 13 Tiernan called plaintiff a "non-white Chinese." Her national origin disparate treatment discrimination claim is based on the written reprimand on April 13, 2001.

FHLB-Topeka asserts that plaintiff did not timely exhaust her administrative remedies as to these claims, and that even if those claims were timely exhausted they do not state claims under Rule 12(b)(6).

      1.     <u>Timeliness Of Plaintiff's Exhaustion</u>

Under 42 U.S.C. § 2000e-5(e)(1) and 12 U.S.C. § 1432(a), plaintiff must exhaust administrative remedies with respect to each discrete alleged discriminatory act by filing an EEOC charge within 180 days after the date on which the act occurred. According to 42 U.S.C. § 2000e-5(e)(1), an aggrieved person must file an EEOC charge within 180 days after the alleged unlawful employment practice unless the person instead "has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e)(1). If a state or local agency possesses jurisdiction to grant or seek relief for the alleged unlawful employment practice, the EEOC will defer its jurisdiction to that agency, and the complainant will be allowed 300 days to initiate his or her complaint with that agency. 42 U.S.C. §§ 2000e-5(c) and (e); 29 C.F.R. § 1601.70. See Mascheroni v. Bd. of Regents, 28 F.3d 1554, 1557 n.3 (10th Cir. 1994). Otherwise, the complainant has only 180 days to file a formal EEOC charge. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). This Title VII administrative exhaustion requirement runs separately from the date of each discrete act of discrimination. "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." Id. at 110. The time period for filing a charge is subject to equitable doctrines such as tolling or estoppel. See id. (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (timely charge of discrimination not jurisdictional prerequisite to federal suit, but like statute of limitations is subject to waiver, estoppel and equitable tolling)). Such doctrines are to be applied sparingly. Id. at 110. Morgan abrogates the continuing violation doctrine for claims of discrimination or retaliation, and replaces it with rule that each discrete incident constitutes an "unlawful employment practice" for which

administrative remedies must be exhausted.  <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210 (10th Cir. 2003) (discrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify and constitute separate actionable unlawful employment practices).  In contrast to discrete acts, hostile environment claims involve repeated conduct.  Therefore, provided that an act which contributed to a hostile work environment occurred within the filing period, acts that fall outside the statutory time period may be considered for purposes of liability.  <u>Morgan</u>, 536 U.S. at 116-17.

The Kansas Acts Against Discrimination, K.S.A. § 44-1001, <u>et seq</u>., authorize the KHRC to seek relief against unlawful discriminatory practices in the private sector and in state and local government in Kansas.  The KHRC is the EEOC-designated and certified "deferral" agency in Kansas.  Therefore, in Kansas, most Title VII plaintiffs have 300 days after a discriminatory act to file charges of discrimination with the EEOC or the KHRC.  Under 12 U.S.C. § 1432(a), however, the Federal Home Loan Banks have the right to "dismiss at pleasure" their officers and employees.  Courts have interpreted this language and identical language in the Federal Reserve Act of 1913, 12 U.S.C. § 341, as preempting the application of state anti-discrimination statutes to employees of regional Federal Home Loan Banks or regional Federal Reserve Banks.  <u>See</u>, <u>e.g.</u>, <u>Arrow v. Fed. Res. Bank of St. Louis</u>, 358 F.3d 392 (6th Cir. 2004); <u>Ana Leon T. v. Fed. Res. Bank of Chi.</u>, 823 F.2d 928 (6th Cir. 1987); <u>Kispert v. Fed. Home Loan Bank of Cincinnati</u>, 778 F. Supp. 950 (S.D. Ohio 1991).  At least one court has held that because state laws cannot confer upon a state agency the jurisdiction to grant or seek relief against a regional FHLB, an aggrieved individual must file an EEOC discrimination charge against a regional FHLB within 180 days after an unlawful discriminatory act, even in a "deferral" state.  <u>See</u> <u>Osei-Bonsu v. FHLB of New York</u>, 726 F. Supp. 95 (S.D.N.Y. 1989).

In Osei-Bonsu, a former employee filed a *pro se* EEOC complaint of national origin discrimination 228 days after the FHLB of New York terminated his employment. The EEOC informed plaintiff that New York is a "deferral" state, that his complaint was therefore timely, and that it would file a copy of his complaint with the appropriate state deferral agency. The EEOC ultimately issued a right-to-sue letter, and plaintiff brought suit. The district court dismissed the suit, finding that plaintiff was required to file his EEOC charge within 180 days because the state deferral agency had no jurisdiction over a regional FHLB. Id. at 96-97. Based on Osei-Bonsu, defendant argues that plaintiff had only 180 days from the date of each discriminatory act to include that act in an EEOC charge. Defendant does not address the only authority directly contrary to Osei-Bonsu.

In Stone v. Nat'l Bank & Trust Co., No. 92-CV-211, 1996 WL 310351 (N.D.N.Y. 1996), the district court rejected defendant's assertion that plaintiff was required to file an EEOC charge against a bank organized under the National Bank Act, 12 U.S.C. § 24(Fifth) which contains the same "dismiss at pleasure" language as 12 U.S.C. § 1432(a). The Stone court stated that the cases on which Osei-Bonsu relied focused on preemption of state employment law, rather than upon the narrow question "whether a National Bank employee must file charges with the EEOC within 180 or 300 days of the alleged discriminatory conduct." The Stone court then examined the ADEA and the National Banking Act and found as follows:

> [t]here is nothing in the ADEA exempting National Bank employees from the broad remedial scheme of that statute, and because Congress was presumptively aware of the National Bank Act when it later enacted the ADEA, the court finds that the fact that plaintiff Stone was an employee of a bank organized under the National Bank Act does not effect his right to file discrimination charges with the EEOC within 300 days of the alleged discriminatory conduct . . . in a deferral state such as New York.

As with the ADEA, Title VII contains no language exempting Federal Home Loan Banks from its broad remedial scheme.  Further, when Congress enacted Title VII in 1964, it was presumptively aware of the Federal Home Loan Bank Act, 12 U.S.C. § 1421, originally passed in 1932.  If Congress had intended to confine Federal Home Loan Bank employees to the 180 day filing period, it could have so provided.  For purposes of determining the filing period, however, Congress distinguished only between deferral and non-deferral states.  Because Kansas is a deferral state, plaintiff here had 300 days in which to file a charge of discrimination.[21]

Plaintiff's KHRC charge of January 22, 2002 alleged three discrete acts: (1) Lowman appearing naked in plaintiff's office on January 6, 2001, (2) Tiernan's delivery of a written reprimand on April 13, 2001 during which he called plaintiff a "non-white Chinese" and (3) the termination of plaintiff's employment on July 26, 2001.  Only the acts on April 13 and July 26, 2001 were within the 300-day charging period.  Therefore, to meet the timely exhaustion requirement, those acts must be reasonably related to plaintiff's harassment.  Defendant asserts that plaintiff's claims of sexual harassment and national origin harassment are not reasonably related to the acts set out in plaintiff's KHRC charge, and therefore she has not timely exhausted those claims.

    a.    <u>Timeliness Of Hostile Work Environment Sexual Harassment Claim</u>

Relying on <u>Patterson v. County of Oneida</u>, 375 F. 3d 206, 220 (2d Cir. 2004), FHLB-Topeka asserts that plaintiff has not alleged any act of sexual harassment which occurred within 300 days of her KHRC charge, <u>i.e.</u> after March 23, 2001, and that she therefore did not timely exhaust this claim.  Plaintiff alleges that FHLB-Topeka subjected her to a pattern of sexual harassment, as

---

[21]    Because the Court finds that the 300 day filing period applies, it does not further address defendants' arguments based on a filing period of 180 days.

follows: (a) from February to May of 1998, Tiernan, a senior vice president, pursued plaintiff for a personal relationship; (b) from late 2000 to February of 2001, Millburn, a vice president, pursued a personal relationship with plaintiff; (c) on January 6, 2001, Lowman, president and CEO, stepped into plaintiff's office without any clothes; (d) on April 13, 2001, FHLB-Topeka issued her a counseling document because she had rejected Lowman's advances; and (e) on July 26, 2001 defendant fired her in part because she had rejected Lowman's advances.  Although plaintiff did not include these facts in her KHRC complaint, she did allege sexual harassment.  These allegations relate to the conduct in her KHRC complaint, and the KHRC and/or the EEOC would have discovered these incidents in the course of investigation.  Plaintiff may therefore rely upon these allegations of sexual harassment.  In Patterson, the Second Circuit granted defendant's motion for summary judgment because plaintiff did not proffer evidence that her termination, even if discriminatory, was in furtherance of the alleged practice of racial harassment.  Id.  By contrast, in this case, plaintiff has alleged that within 300 days of her KHRC complaint, FHLB-Topeka issued her a counseling document and then fired her because she declined Lowman's advances.  The Court finds that plaintiff has timely exhausted her administrative remedies as to her claim of sexual harassment.

       b.      Timeliness Of National Origin Hostile Work Environment Claim

Defendant asserts that plaintiff did not timely exhaust her national origin hostile work environment claim.  Plaintiff alleges that FHLB-Topeka subjected her to a hostile work environment based on national origin, as follows: (1) on April 12, 2001, plaintiff received a work assignment with an unreasonably short deadline "but for her race," Amended Complaint ¶¶ 72-73, and (2) in a meeting on April 13, 2001 Tiernan, her supervisor, gave her two counseling documents because of her "race."

-54-

The documents counseled plaintiff to accept Bunting's restraining order; counseled her for an act of insubordination in sending e-mails to her various supervisors to complain about their conduct toward her at a meeting on March 9, 2001; counseled her for taking two hours of sick leave on April 12, 2001; and criticized her for setting her work hours arbitrarily to suit her own needs.[22]  See id.  ¶¶ 72-78. Finally, plaintiff alleges that, during the April 13 meeting at which he delivered the counseling documents, Tiernan called her a "non-white Chinese."  Id. ¶ 75.  Defendant asserts that plaintiff did not exhaust her remedies because none of the three discrete acts which she alleged in her KHRC charge of January 22, 2002 relate to her national origin hostile work environment claims.  Defendant ignores the fact that the KHRC charge included plaintiff's allegation that on April 13, 2001, Tiernan called her a "non-white Chinese."  Id.  This statement, if construed as a racial slur, was made during the charging period.  The Court finds that plaintiff timely exhausted her claim of national origin hostile work environment.

> 2.    Sufficiency Of Claims Under Rule 12(b)(6)

> > a.    Disparate Treatment Based On Sex

FHLB-Topeka asserts that plaintiff has not alleged sex discrimination which is actionable under Title VII.  Section VI of the amended complaint sets out "Discriminatory Employment Practices," including subsection(b), "Sex Discrimination and Sexual Harassment." Section VI(b) focuses mainly on allegations of sexual harassment, but liberally construed the

---

[22]    FHLB-Topeka argues that plaintiff does not plead any facts from which one may infer a discriminatory motive and that the bank's reasons for taking the actions were legitimate and non-discriminatory.  Based on notice pleading, however, plaintiff is not required to assert that defendant admits that it had discriminatory intent.  Defendant's arguments are more appropriate to a motion for summary judgment.

amended complaint asserts that FHLB-Topeka discriminated on account of sex when it issued

plaintiff a counseling document on April 13, 2001 and terminated her employment on July 26, 2001.

FHLB-Topeka is not entitled to dismissal of plaintiff's claim of sex discrimination.

b.   <u>National Origin Hostile Work Environment</u>

Plaintiff alleges that FHLB-Topeka subjected her to a hostile work environment

based on national origin.  Specifically, plaintiff alleges that on April 12, 2001, she received a work

assignment with an unreasonably short deadline "but for her race." <u>Id.</u> ¶¶ 72-73.  Second, plaintiff

alleges that in a meeting on April 13, 2001, Tiernan, her supervisor, gave her two counseling

documents because of her race.  The documents counseled plaintiff to accept Bunting's restraining

order; counseled her for an act of insubordination in sending e-mails to her various supervisors to

complain about their conduct toward her at a meeting on March 9, 2001; counseled her for taking two

hours of sick leave on April 12, 2001; and criticized her for setting her work hours arbitrarily to suit

her own needs.[23]  <u>See id.</u> ¶¶ 72-78.  Finally, plaintiff alleges that during the meeting on April 13, 2001,

at which he delivered the counseling documents, Tiernan called her a "non-white Chinese." <u>Id.</u> ¶ 75.

The Court considers these acts to determine whether – taken together – they constitute a hostile work

environment based on plaintiff's national origin.  <u>Morgan</u>, 536 U.S. at 116-17.

An actionable hostile work environment only exists "when the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." <u>Morgan</u>, 536

---

[23]     FHLB-Topeka argues that plaintiff does not plead any facts from which one may infer
a discriminatory motive and it that took actions for legitimate and non-discriminatory reasons.
Defendant's arguments are more appropriate to a motion for summary judgment.

U.S. at 116; Sandoval v. Boulder Reg'l Commc'ns, 388 F. 3d. 1312, 1327 (10th Cir. 2004); Jones v. Barnhart, 349 F.3d 1260, 1268 (10th Cir. 2003). In deciding whether a work environment is hostile on the basis of national origin, courts "must examine all of the circumstances alleged including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Morgan, 536 U.S. at 116; Jones, 349 F.3d at 1268. Demonstrating a hostile work environment "requires plaintiff to assert more than a few isolated incidents of racial enmity." Jones, 349 F.3d at 1268 (quoting Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994)). Instead of sporadic national origin slurs, there must be a steady barrage of opprobrious national origin comments. See Bolden, 43 F.3d at 551. Ultimately, plaintiff must show that defendant targeted her for harassment because of her national origin. Sandoval, 388 F. 3d. at 1327.

Plaintiff's amended complaint alleges four incidents in which supervisors or co-employees mentioned her Chinese national origin or communications skills. First, plaintiff alleges that on September 15, 2000, Williams, a co-worker, "yelled at" her because of her Chinese accent and because she did not understand that the American custom of "baby shower" gift-giving. See Amended Complaint ¶ 168. Plaintiff does not allege that Williams was her supervisor, or that Williams criticized her Chinese accent or national origin on any other occasion.

Second, plaintiff alleges that on September 20, 2000, FHLB-Topeka gave her a counseling document which, among other things criticized her Chinese accent and poor communication skills in English. The document required plaintiff to undertake some formal process to improve her English communications skills.

-57-

Third, plaintiff alleges that on February 26, 2001, FHLB-Topeka gave her an "adverse" annual evaluation which criticized her communications skills and suggested that "reading non-technical material (e. g., articles in Time or Newsweek) would help expand your understanding of written communication and your grasp of those cultural elements that play such a vital role in everyday conversation." Id. ¶ 175. Plaintiff understood this suggestion as a hostile national origin comment because her supervisors knew that they had no communication problem with her and because Williams did not receive a similar requirement.

Fourth, plaintiff alleges that on April 13, 2001, Tiernan called her a "non-white Chinese." At most, plaintiff alleges only two derogatory references to her national origin: Williams, a co-worker, yelling at her on September 15, 2000 and Tiernan, a manager, calling her a "non-white Chinese" on April 13, 2001.

FHLB-Topeka asserts that these incidents are fewer in number and milder than incidents held not to constitute "severe or pervasive" harassment. See Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (five mild incidents of harassment over 16 month period did not create hostile working environment); see also Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) (three episodes insufficient). The cases on which FHLB-Topeka relies, however, address motions for summary judgment. The standard for a motion to dismiss requires only that plaintiff set out a claim on which relief may be granted. Plaintiff has sufficiently alleged that she was subjected to a hostile work environment based on her national origin.[24]

---

[24]   FHLB-Topeka also asserts that plaintiff pleads away her claims of sex and national origin discrimination when she alleges that FHLB-Topeka told her that it first counseled her and then terminated her employment because she showed substandard work performance for her education

(continued...)

c.    National Origin Disparate Treatment

FHLB-Topeka asserts that plaintiff has not stated a claim for disparate treatment on the basis of national origin because she does not allege that defendant took adverse employment action because of national origin.  Other than discharge or refusal to hire, employer conduct only constitutes "adverse employment action" if it alters the employee's compensation, terms, conditions or privileges of employment, or adversely affects his or her status as an employee. Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857-858 (10th Cir. 2000).  FHLB-Topeka correctly points out that plaintiff does not allege that the bank terminated her employment because of her national origin.  Rather, she asserts that the reprimand which defendant gave her on April 13, 2001 constituted disparate treatment based on national origin.[25]  Defendant correctly points out that plaintiff has not alleged that the reprimand resulted in a loss or pay or an adverse change in the terms, conditions or privileges of employment.  Thus, she has not alleged an adverse employment action based on national origin.  See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).

---

[24](...continued)
and salary, had poor communications skills, made transcription errors and attempted to hide them, refused to work a daily schedule of 7:30 a.m. to 4:30 p.m. and used the bank's time and resources to work on personal legal matters.  If true, these are legitimate, non-discriminatory reasons for disciplining an employee.  Compare, e.g., Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (poor work performance); Merrick v. N. Natural Gas Co., 911 F.2d 426, 430 (10th Cir. 1990) (insubordination, combative personality and poor communication skills); Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877-78 (10th Cir. 2004) (failure to comply with attendance policy).  FHLB-Topeka points out these alleged reasons for plaintiff's termination, on their face, do not relate in any way to her gender or national origin.  Plaintiff, however, has alleged that FHLB-Topeka fired her because of her gender or national origin.  At the pleading stage, she does not need to do more.

[25]    On April 13, 2001, Tiernan reprimanded plaintiff for complaining about conduct of other employees and for arbitrarily setting her own work hours.  During that meeting Tiernan called plaintiff a "non-white Chinese."

C.      **The Rehabilitation Act**

Plaintiff makes no specific claims under the Rehabilitation Act but paragraph 44 of the amended complaint includes a single citation to "29 U.S.C. § 791, et seq."  Plaintiff does not allege that FHLB is an entity regulated by the Rehabilitation Act – that is, a federal agency or a recipient of federal funds for the limited purposes set forth in 29 U.S.C. §§ 793 and 794.[26]  Thus, she does not state a claim under the Rehabilitation Act.

D.      **ADA**

Plaintiff alleges that FHLB-Topeka violated her ADA rights when it refused her request for a modified schedule and terminated her employment because she would not agree to a schedule from 7:30 a.m. to 4:30 p.m.  Plaintiff alleges, however, that even without the accommodation to which she was allegedly entitled, she performed her duties satisfactorily throughout her employment at FHLB-Topeka.  An employee who is able to perform the essential functions of her position without any

---

[26]      29 U.S.C. § 793 provides in part:

> Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities.

29 U.S.C. § 794 provides in part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service

accommodation cannot make a claim for a reasonable accommodation.  See Croy v. Cobe Labs., 345

F.3d 1199, 1204 (10th Cir. 2003) (plaintiff who claimed satisfactory job performance could not show

substantial limitation of major life activity of work).  Because plaintiff has not alleged that she was

unable to perform the essential functions of her job, she cannot set forth an actionable claim that

defendant denied her a reasonable accommodation necessary to enable her to perform those job

functions.  See Davidson v. Am. Online, 337 F.3d 1179, 1190 (10th Cir. 2003).

### E.  FMLA

Plaintiff alleges that on two occasions between September of 1999 and May of 2000 she told

her supervisors that she was using her "sick leave, lunch time, vacation time, etc." for doctors'

appointments because of a serious health condition (depression and post-traumatic stress disorder).

Plaintiff also alleges that defendant disciplined her for being tardy or for taking unscheduled leave on

three occasions.  Plaintiff does not allege that she either requested or received FMLA leave on any of

these occasions.  FHLB-Topeka argues that plaintiff's FMLA claim should be dismissed because she

does not allege that she ever asked for FMLA leave.

The FMLA provides in relevant part that "an eligible employee shall be entitled to a total of

12 workweeks of leave during any 12 month period for one or more of the following . . . (D) Because

of a serious health condition that makes the employee unable to perform the functions of the position

of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA makes it "unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under

the FMLA."  Id. § 2615(a)(1).  Regulations require that an employee provide at least verbal notice of

his or her desire to take FMLA-qualifying leave.  29 C.F.R. § 825.302(a), (c) (2001); see also

Goodwin-Haulmark v. Menninger Clinic, Inc., 76 F.Supp.2d 1235, 1241 (D. Kan. 1999) (citing §§ 825.302(a) and 825.302(c)).  When requesting leave, the employee need not expressly assert his or her rights under the FMLA or even mention the FMLA, so long as he or she provides the employer sufficient information to determine that the FMLA might be invoked.  Id. § 825.302(c); see also Goodwin-Haulmark, 76 F. Supp.2d at 1241 (citing § 825.302(c)).  Once the employer is on notice that an employee might be eligible for FMLA benefits, the employer has a duty to notify the employee that the FMLA might apply.  Id. § 825.208(a); see also Tate v. Farmland Indus., Inc., 268 F.3d 989, 997 (10th Cir. 2001) (citing § 825.208(a)).

FHLB-Topeka asserts that plaintiff does not specifically allege that (1) her medical condition on any of the occasions set out above constituted a "serious health condition" as defined in 29 C.F.R. § 825.114, (2) she notified FHLB of any condition that might be a "serious health condition" in connection with those absences, or (3) she requested FMLA leave on those occasions.  FHLB-Topeka argues that plaintiff has not alleged that she ever qualified for or requested FMLA leave, or that FHLB-Topeka interfered with her use of such leave or retaliated against her for requesting or using it.  This argument ignores plaintiff's alleged action that she told her supervisor that she was suffering from post traumatic stress disorder and depression.  This was sufficient information from which the bank might conclude that plaintiff might want to invoke FMLA leave.  Further, plaintiff has alleged that FHLB-Topeka disciplined her for taking sick leave to attend to her serious medical condition. FHLB-Topeka is not entitled to dismissal of plaintiff's claim under the FMLA.

**F.**     **Equal Pay Act**

Plaintiff alleges that FHLB-Topeka violated her rights under the Equal Pay Act because it paid her less than males with Ph. D. degrees and because it fired her two days after she complained that FHLB-Topeka hired women for lower-paying jobs than men. FHLB-Topeka argues that plaintiff has not set forth a claim under the EPA. First, it asserts that plaintiff's salary discrimination claim fails because she does not allege that FHLB-Topeka paid similarly situated male employees more than it paid her. Plaintiff alleges that two male employees with Ph.D. degrees had higher salaries than she did, but she does not allege that the males had jobs which were "substantially equal in terms of skill, effort, responsibility, and working conditions." Sandoval, 388 F.3d at 1327-28 (quoting Sprague, 129 F.3d at 1364). Plaintiff compares herself to Chris Shumaker, who worked as a risk analyst, but she does not allege any facts about his pay. Plaintiff has not set forth a viable claim for salary discrimination under the EPA, and this claim is therefore dismissed.

FHLB-Topeka next asserts that plaintiff's retaliation claim must fail because the time between her first alleged complaint on October 31, 1998 and the alleged retaliation – her termination on July 26, 2001 – is too long to raise an inference of retaliation. Plaintiff alleges that on October 31, 1998 she complained that she earned less than the two male employees with Ph.D. degrees. A plaintiff may base an EPA retaliation claim on adverse action taken after an employee makes a good faith internal complaint of an EPA violation, even if no EPA violation has actually occurred. Love v. Re/Max of Am., Inc., 738 F.2d 383, 387 (10th Cir. 1984). Plaintiff alleges that FHLB-Topeka retaliated against her by firing her on July 26, 2001, almost three years after her only internal complaint. This time lapse does not support an inference of retaliation. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999); Richmond, 120 F.3d at 209 (three months is too long).

Plaintiff, however, also alleges that on July 24, 2001 two days before her termination, she made an internal complaint that defendant was hiring women for lower-paying jobs at FHLB-Topeka. The bank points out that plaintiff does not allege that she complained that such women were hired to perform substantially the same jobs as a higher-paid males. FHLB-Topeka asserts that plaintiff's remarks on July 24, 2001 were not protected activity under the EPA and thus do not support a claim for EPA retaliation. The Court finds, however, that given the ambiguity of plaintiff's statement on July 24, 2001, and plaintiff's pro se status, the amended complaint adequately sets out a claim for EPA retaliation.

### G.   FLSA

Plaintiff claims that FHLB-Topeka violated the FLSA when it improperly "demoted" her from "exempt" to "nonexempt" status, thus making her eligible for overtime pay, without paying her overtime. The FLSA sets forth the general requirement that workers receive overtime compensation for hours worked in excess of 40 forty per week. 29 U.S.C. § 207. Reich v. Chi. Title Ins. Co., 853 F. Supp. 1325, 1328 (D. Kan. 1994). As FHLB-Topeka points out, however, plaintiff does not allege that she ever worked overtime. Plaintiff has not set forth a claim under the FLSA.

### H.   RICO

This Court has already found that plaintiff has not established subject matter jurisdiction for her RICO claim. Defendants alternatively argue that the Court should dismiss plaintiff's RICO claim for failure to state a claim. This Court recently stated that in order to survive a motion to dismiss a claim under Section 1962(c), plaintiff must plead all elements of a RICO violation: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Burdett, 260 F. Supp.2d at 1121; see

Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); BancOkla. Mortgage Corp. v. Capital

Title Co., Inc., 194 F.3d 1089, 1100 (10th Cir. 1999).  A pattern of racketeering activity must include

commission of at least two predicate acts.  Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th

Cir. 2003).  Those predicate acts must be part of a pattern of racketeering activity.  Further, plaintiff

must allege with particularity each element of a RICO violation and its predicate acts of racketeering,

a requirement which is justified by the threat of treble damages and injury to reputation.  Gottstein

v. Nat'l Ass'n For The Self-Employed, 53 F. Supp.2d 1212, 1218 (D. Kan. 1999).

Defendants argue that plaintiff has not pled the elements of a RICO violation because (1) she

has not plead minimal factual allegations for two predicate acts necessary to support her RICO claim;

(2) her bank fraud allegations lack the required particularity, including time, place and content of the

claimed acts; (3) the witness tampering allegations fail to meet RICO definitions; and (4) plaintiff

alleges no "continuity plus relationship" between her alleged acts of bank fraud and witness

tampering.  For substantially the reasons set forth in defendants' briefs, the Court finds that even if

it had subject matter jurisdiction over plaintiff's RICO claims, plaintiff has not set forth any actionable

RICO claims and any such claims must be dismissed.[27]

---

[27]     The Topeka defendants also assert that plaintiff has failed to state any common law
contract claim which might be raised by the complaint.  Such a claim might be characterized as a
claim for breach of an implied employment contract with plaintiff when FHLB-Topeka (1) terminated
her employment contrary to the terms of its Employee Handbook and (2) refused to pay for a
correspondence law school in which plaintiff enrolled after the FHLB Topeka required her to take
a class to improve her English skills.  Defendants assert that 12 U.S.C. § 1432(a), which regulates
regional Federal Home Land Bank employment relationships to the exclusion of state law, preempts
plaintiff's state law claims of breach of implied employment contract or wrongful termination against
regional Federal Home Land Banks.  See Andrews v. Fed. Home Loan Bank of Atlanta, 998 F.2d 214
(4th Cir. 1993) (in wrongful termination case, 12 U.S.C. § 1432 "at pleasure" language preempts any
state-created employment rights); Inglis v. Feinerman, 701 F.2d 97, 98-99 (9th Cir. 1983) (12 U.S.C.
(continued...)

**III.     Motion Of Federal Housing Finance Board ("Finance Board")**

  The Finance Board asserts that is entitled to sovereign immunity and that this Court therefore lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  Alternatively, the Finance Board asserts that plaintiff has failed to state a claim upon which relief can be granted against it under Fed. R. Civ. P. 12(b)(6).

---

[27](...continued)
§ 1432 precludes creation of employment rights from employment manual).  Plaintiff does not include any breach of contract claim in her enumeration of claims, however, and the Court will not construct such a claim for her.

**A.      Sovereign Immunity**

As noted, the Finance Board asserts that is entitled to sovereign immunity and that this Court therefore lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  Except as it consents to be sued, the United States as sovereign is immune from suit.  United States v. Testan, 424 U.S. 392, 399 (1976).  This immunity extends to injunctive relief.  Hatahley v. United States, 351 U.S. 173, 176 (1956); United States v. Murdock Mach.& Eng'g Co.,81 F.3d 922, 930 (10th Cir. 1996).  The Finance Board is a federal agency, and as such it is entitled to sovereign immunity.  See Furash & Co. v. United States, 46 Fed. Cl. 518, 520 (Fed. Ct. Cl. 2000).

A party who asserts a cause of action against the United States or its agencies must allege and establish that Congress has unequivocally expressed its intention to waive the government's sovereign immunity as to the particular action.  F.D.I.C. v. Meyer, 510 U.S. 471 (1994).  In her statement of jurisdiction, plaintiff cites Title VII and the ADEA, both of which contain limited waivers of the sovereign immunity of the United States.  See 42 U.S.C. § 2000e-16; 29 U.S.C. § 633A. These statutes speak to actions against employers, however, and plaintiff has not alleged that she was an employee of the United States.  Plaintiff in fact alleges that the Federal Home Loan Bank of Topeka, not the Federal Housing Finance Board, was her employer.  In 1989, Congress amended the Federal Home Loan Bank Act to provide that Federal Home Loan Bank employees are not employees of the United States.[28]  See 12 U.S.C. § 1422b(a)(2).  Congress has not waived the sovereign immunity of the

---

[28]      Courts have consistently held that Federal Home Loan Banks and other similarly situated financial institutions are not federal agencies.  See e.g., Lewis v. United States, 680 F.2d 1239 (9th Cir. 1982) (dismissing for lack of subject matter jurisdiction suit against United States under Federal Tort Claims Act after plaintiff was injured by automobile owned and operated by Federal Reserve Bank of San Francisco because bank not federal agency); see also Mendrala v. Crown
(continued...)

Finance Board because the Finance Board is not plaintiff's employer.  Although plaintiff alleges in her civil rights claims that the Finance Board failed to prevent wrongs set out in her Amended Complaint, she has not alleged any basis for a waiver of the Board's sovereign immunity.  Congress has not waived sovereign immunity with respect to constitutional torts under any statute.  See Meyer, 510 U.S. at 477-78.  The Court concludes that the Finance Board is entitled to sovereign immunity as to each of plaintiff's claims against it.

**IT IS THEREFORE ORDERED** that the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want of Subject Matter Jurisdiction (Doc. #117) filed May 25, 2005, the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint For Failure To State A Claim (Doc. #118) filed May 25, 2005 and the Supplement To Plaintiff's Opposition To Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction – The Attachment Of Plaintiff's Outline Of Her Second Amended Complaint (Doc. #120) filed June 6, 6, 2005, which the Court construes as motions for leave to file a second amended complaint, be and hereby are **OVERRULED**.

**IT IS FURTHER ORDERED** that the Topeka Defendants' Motion To Strike Plaintiff's Supplements (Doc. # 121) filed June 8, 2004, be and hereby is **OVERRULED AS MOOT.**

---

[28](...continued)
Mortgage Co., 955 F.2d 1132, 1138-39 (7th Cir. 1992) (Federal Home Loan Mortgage Corporation is not federal agency under FTCA because its stock is wholly owned by private investors, it receives no federal funds, and its activities are controlled by board of directors, the majority of which is elected by its stockholders).

**IT IS FURTHER ORDERED THAT** The Topeka Defendant's Motion To Dismiss Plaintiff's Amended Complaint In Part For Want Of Subject Matter Jurisdiction (Doc. #86) filed February 15, 2005, be and hereby is **SUSTAINED IN PART.  The Court dismisses plaintiff's claims under 42 U.S.C. §§ 1982 (Count 1(b)), 1985 (Count 2(a)), and 1986 (Count 2(b)); plaintiff's claims under Title II (Count 3), the FHA (Count 4), the Sarbanes-Oxley Act (Count 7), RICO, 18 U.S.C. §§ 1344, 1512-13 (Count 8) and the ADA (Count 9(a)); plaintiff's claims of race discrimination (Count 10(f)) and retaliation under Title VII (Count 10(i)); and plaintiff's ADEA claim, 29 U.S.C. § 621 et seq. (Count 10(j)).**

**IT IS FURTHER ORDERED THAT** The Topeka Defendants' Motion To Dismiss Plaintiff's Amended Complaint For Failure To State A Claim (Doc. #88) filed February 15, 2005 be and hereby is **SUSTAINED IN PART**.  **The Court dismisses plaintiff's claims under the First,  Fifth, Thirteenth and Fourteenth Amendments (Counts 5, 6(a) and 6(b)); RICO, 18 U.S.C. §§ 1344, 1512-13 (Count 8); plaintiff's claims for national origin disparate treatment under Title VII (Count 10(g); plaintiff's EPA claim for salary discrimination (Count 10(b)); and plaintiff's FLSA claim (Count 10(a)).**

**All claims which remain are against FHLB-Topeka, as follows:**

(1)      **plaintiff's claim that defendant discriminated on the basis of race in violation of 42 U.S.C. § 1981 when it terminated plaintiff's employment because she would not accept the state court restraining order as a condition of her employment (Count 1(a));**

(2)     plaintiff's claim that defendant terminated her employment for refusing to follow a 7:30 a.m. to 4:30 p.m. work schedule in violation of the FMLA, 29 U.S.C. 2611 et seq. (Count 9(b));

(3)     plaintiff's claim that defendants terminated her employment in retaliation for engaging in activity protected under the EPA, i.e. for complaining that FHLB-Topeka hired women for lower-paying jobs than men, in violation of 29 U.S.C. § 215(a)(3) (Count 10(c));

(4)     plaintiff's claim that defendant maintained a sexually hostile work environment in violation of Title VII (Count 10(d));

(5)     plaintiff's claim that because of her sex, defendant terminated plaintiff's employment in violation of Title VII (Count 10(e)); and

(6)     plaintiff's claim that defendant maintained a hostile work environment based on national origin in violation of Title VII (Count 10(h)).

IT IS FURTHER ORDERED that the Motion Of Federal Housing Finance Board To Dismiss (Doc. #93) filed March 9, 2005 be and hereby is SUSTAINED.

IT IS FURTHER ORDERED that all of the individual defendants, and the Federal Housing Finance Board, be and hereby are dismissed as parties.

Dated this 22nd day of September, 2005 at Kansas City, Kansas.

s/Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-70-